**18 CV 5981**

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

Division

|  |  |
|---|---|
| DEBORAH S. ASCHHEIM | Case No. _____ |
|  | *(to be filled in by the Clerk's Office)* |
| *Plaintiff(s)* | |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | Jury Trial: *(check one)* ☒ Yes ☐ No |
| **-v-** | |
| NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION | |
| *Defendant(s)* | |
| *(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

## I.   The Parties to This Complaint

### A.   The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Deborah S. Aschheim |
| Street Address | 383 West End Avenue |
| City and County | New York |
| State and Zip Code | NY 10024 |
| Telephone Number | 917.882.9949 |
| E-mail Address | debaschheim@gmail.com |

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

**B.      The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | New York City Economic Development Corporation |
| Job or Title *(if known)* | |
| Street Address | 110 William Street |
| City and County | New York      New York |
| State and Zip Code | NY 10038 |
| Telephone Number | (888) 692-0100 |
| E-mail Address *(if known)* | oshani@edc.nyc |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Telephone Number

E-mail Address *(if known)*

## C.    Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | New York City Economic Development Corporation |
| Street Address | 110 William Street |
| City and County | New York       New York |
| State and Zip Code | NY  10038 |
| Telephone Number | (888) 692-0100 |

## II.    Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☒          Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note:  In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☒          Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note:  In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐          Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note:  In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐          Other federal law *(specify the federal law)*:

☒          Relevant state law *(specify, if known)*:

NYS Human Rights Law

☒          Relevant city or county law *(specify, if known)*:

NYC Human Rights Law (Administrative Code of The City of New York, Title 8)

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

- ☒    Failure to hire me.
- ☐    Termination of my employment.
- ☐    Failure to promote me.
- ☐    Failure to accommodate my disability.
- ☐    Unequal terms and conditions of my employment.
- ☐    Retaliation.
- ☒    Other acts *(specify)*:    Unlawful discrimination on the basis of age

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s)

April 19, 2017

C.    I believe that defendant(s) *(check one)*:

- ☒    is/are still committing these acts against me.
- ☐    is/are not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

- ☐    race    _____
- ☐    color    _____
- ☐    gender/sex    _____
- ☐    religion    _____
- ☐    national origin    _____
- ☒    age *(year of birth)*    1955    *(only when asserting a claim of age discrimination.)*
- ☐    disability or perceived disability *(specify disability)*

E.    The facts of my case are as follows. Attach additional pages if needed.

Aschheim vs NYCEDC  4

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

In or about February, 2016, Plaintiff applied for the position of Director, Risk Management & Insurance with Defendant, NYCEDC.  This was in response to Defendant's job posting on its website. ("Posting #1").  While Plaintiff's candidacy advanced through the NYCEDC hiring process, Defendant notified Plaintiff that the qualifications for the position had been lowered.  Plaintiff continued in the interview process.  Eventually, Defendant notified Plaintiff that the search was suspended and that Posting #1 would not be filled.

In or about February 2017, Plaintiff observed that Defendants reposted the position ("Posting #2").  But for a change in the job title and a reordering of the requirements of the postion from Posting #1, Posting #2 was identical with Posting #1.  Once again, Plaintiff applied for the position.

Plaintiff submitted her application for Posting #2.  Almost immediately after she submitted her updated application, Plaintiff received a phone call from Defendant acknowleding her renewed candidacy.  Aware of Plaintiff's prior application and candidacy, Defendant advised Plaintiff that Posting #2 had changed from Posting #1 as follows:  (1) the title for the position had been lowered; (2) the reporting lines had been lowered and Plaintiff would report to someone signficantly younger and junior to Plaintiff; and (3) the salary compensation had been lowered by more than 35%.  Defendant also informed Plaintiff that the qualifications remained virtually identical and that employment benefits remained generous and the same as with Posting #1.  Defendant asked Plaintiff how she felt about reporting to someone younger and less experienced than she, and how Plaintiff felt about acccepting a salary that was significantly lower than under Posting #1.  Plaintiff responded that all these items/changes were acceptable to her.  Plaintiff was invited to interview for Posting #2.

Plaintiff was invited to interview for Posting #2 with the same people who interviewed her for Posting #1.  Plaintiff's candidacy was advancing, and she was invited for further interviews.  Shortly before her last scheduled interview, on April 19, 2017, Defendant abruptly cancelled the interview and informed Plaintiff that the position was filled.  Plaitiff subsequently learned that the position was filled by someone significantly younger than she – "in her mid 30's" – and with significantly less qualifications than Plaintiff and without qualifications listed in Posting #2.

Defendant wilfully refused to hire Plaintiff because of her age.  Defendant wrongfully discriminated against Plaitiff by unlawfully making age – and being under 40 – a qualification for the position.

Relevant documentation is included with this Complaint as APPENDIX 1 and includes the following:

Exhibit A – NYCCHR / Aschheim Complaint (August 17, 2017)
Exhibit B – NYCEDC Reply Letter (Proskauer October 31, 2017) to NYCCHR
Exhibit C – Plaintiff Rebuttal (December 11, 2017) to NYCCHR
Exhibit D – NYCCHR Dismissal for Administrative Purposes (January 24, 2017) to Plaintiff
Exhibit E – Plaintiff Right To Sue Request to EEOC (March 5, 2018)
Exhibit F – EEOC Right to Sue Letter (Received by Plaintiff April 9, 2018)

A copy of Plaintiff's May 23, 2017 letter to NYCCHR (44 pages) contains a record of materials in support of this Claim, and is available upon request.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV.    Exhaustion of Federal Administrative Remedies

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

March 5, 2018

B.    The Equal Employment Opportunity Commission *(check one)*:

☐    has not issued a Notice of Right to Sue letter.

☒    issued a Notice of Right to Sue letter, which I received on *(date)*    4/9/2018    .

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.    Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☒    60 days or more have elapsed.

☐    less than 60 days have elapsed.

## V.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Actual Damages =    $ 464,657
Punitive Damages = $1,393,971

Please see Appendix 2 attached to this Complaint

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          7/2/2018

Signature of Plaintiff

Printed Name of Plaintiff    Deborah S. Aschheim

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

Exhibit A

Aschheim Vs. New York City Economic Development Corporation (NYCEDC)

III.E   Supplement Materials

Exhibit A - NYCCHR / Aschheim Complaint (August 17, 2017)

CITY OF NEW YORK
COMMISSION ON HUMAN RIGHTS

In the Matter of the Complaint of:

DEBORAH ASCHHEIM,

              Complainant.

   - against -

NEW YORK CITY ECONOMIC
DEVELOPMENT CORPORATION,

              Respondent

Complaint No.:  M-E-A-17-24252
Federal Charge No: 16F-2017-XXXXXX

Verified Complaint

Deborah Aschheim, complaining of Respondents, alleges as follows:

1. Complainant Deborah Aschheim lives at 383 West End Avenue, New York. NY 10024. Complainant is sixty-two (62) years old.

2. Respondent New York City Economic Development Corporation ("NYCEDC") is an employer as defined by § 8-102 of the Administrative Code of the City of New York ("Code"). Respondent NYCEDC employs twenty (20) or more people. Respondent NYCEDC's address for service of process is New York City Economic Development Corporation, 110 William Street, Attn: President, New York, New York 10038.

3. In or around February 2016, Respondent NYCEDC posted a job opening for Director, Risk Management & Insurance. In or around March 8, 2016, Complainant submitted her application for this position.

4. In or around mid-March, 2016, Complainant was contacted via telephone call and email by Orit Shani, a member of Respondent's recruiting team, who conducted a phone screening of Complainant. After this screening, Complainant was invited by Shani to meet with Respondent's recruiting team.

5. On or about March 23, 2016, Complainant met with Orit Shani, John McGlynn, and Fred D'Ascoli, Respondent's employees. During this meeting, Complainant discussed her experiences and qualifications. Messieurs McGlynn and D'Ascoli said that they were impressed by Complainant, or words to that effect, and inquired into how quickly Complainant could transition to the position.

6. Shortly after the March 23, 2016 meeting, Complainant was invited to meet with additional NYCEDC representatives. On or about April 20, 2016, Complainant met with

Spenser Hobson and Kim Vicarri, senior employees at Respondent NYCEDC. Complainant also received positive feedback during this meeting.

7. During the April 20, 2016 meeting, Complainant was informed that the position for which she was interviewing would be undergoing some refinement and redefinition, with possible changes to reporting lines. Pursuant to this likely change, Complainant was asked how she would feel about reporting to someone with less experience than she had or who was younger than her. Complainant responded that this would not be a problem for her and that it had never been a problem for her in the past. Complainant reiterated her strong interest in the position.

8. In or around May 2016, Complainant contacted Respondent NYCEDC and was told that NYCEDC was close to concluding its interview process and that Complainant was still in the running and remained a strong candidate in their estimation. Complainant reiterated her strong interest in the position before concluding the conversation.

9. In or around June 23, 2016, Complainant received an email informing her that Respondent NYCEDC would not be proceeding with her application.

10. In or around February 2017, Complainant saw that the position for which she had applied in 2016 had been reposted online with slight modifications.

11. In or around February 2017, Complainant reapplied to the reposted position. Immediately thereafter, Shani telephoned Complainant, and they discussed her continuing interest in the position, as well as what Complainant had done during the intervening year. Shani also explained some slight changes to the position and its reporting structure, as well as a 35% reduction in salary. Complainant affirmed that she was still interested in the position despite these changes.

12. On or about March 13, 2017, Complainant met with McGlynn and updated him on her experience since they last met in 2016. Complainant detailed her technological and financial reporting and analytical skills. Complainant also listed the professional credentials that she had earned since their previous meeting. McGlynn told Complainant that he had previously endorsed her candidacy and her transition plan.

13. On or about April 4, 2017, Complainant contacted McGlynn and told him that she was pursuing additional professional credentialing. McGlynn called Complainant shortly thereafter and reiterated that Complainant was a very strong candidate. That same day, Earl Joaquin of the NYCEDC Talent Team called Complainant to schedule her next round of interviews. Complainant's interview was scheduled for April 21, 2017.

14. On or about April 19, 2017, Complainant's interview was canceled when she received an email from Shani, informing her that Respondent was proceeding with a different candidate.

2

15. Complainant charges that Respondents discriminated against her by refusing to hire her based upon her actual or perceived age, in violation of § 8-107(1)(a) of the Code.

16. Complainant further charges that Respondents violated the Age Discrimination Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and hereby authorizes the New York City Commission on Human Rights to accept this Verified Complaint on behalf of the Equal Employment Opportunity Commission.

Deborah Aschheim, being duly sworn, deposes and says: that I am the Complainant herein; I have read (or had read to me) the foregoing Complaint and know the content thereof; that the same is true of my own knowledge except as to the matters therein stated on information and belief; and that as to those matters, I believe the same to be true.

_Deborah Aschheim_
Deborah Aschheim

Subscribed and sworn to before me
this __17__ day of _August_, 2017.

_(Signature of Notary Public)_
(Signature of Notary Public)
Prepared by: Conor Ahern

CONOR DANIEL AHERN
Notary Public, State of New York
Reg. No. 02AH6357103
Qualified in Kings County
Commission Expires April 17, 2021

3

Exhibit B

Aschheim Vs. New York City Economic Development Corporation (NYCEDC)

III.E   Supplement Materials

Exhibit B - NYCEDC Reply Letter (Proskauer October 31, 2017) to NYCCHR

 **Commission on Human Rights**

**Mailing Address:** P.O. Box 2023 | New York, NY 10272
**Central Office Address:** 22 Reade St. | New York, NY 10007

October 31, 2017

**VIA REGULAR MAIL**

Ms. Deborah Aschheim
383 West End Avenue
New York, NY 10024

      Re:    *Deborah Aschheim v. New York City Economic Development Corporation*
                Complaint No. M-E-A-17-24252

Dear Ms. Aschheim:

Enclosed please find a copy of Respondents' Answer and Position Statement in response to your Complaint. Please review the documents carefully and compose a written Rebuttal. In your Rebuttal, please include specific instances where your recollection does not match what Respondents stated or the documents submitted. Please submit any relevant documentation not already provided as well as any names and contact information for additional witnesses who could corroborate your claim.

Please submit your written Rebuttal to the enclosed Answer and Position Statement no later than **November 21, 2017.** In the event that the Commission does not receive your written Rebuttal on that date and no request for an extension has been granted, it will assume that you chose not to submit a Rebuttal.

Regards,

Conor Ahern

**Proskauer》**  Proskauer Rose LLP   Eleven Times Square   New York NY 10036-8299

17  OCT 30  A 11: 26

October 27, 2017

**By Federal Express**

Edna D. Guerrasio
Attorney at Law
d 973.274.3219
f 973.274.3299
eguerrasio@proskauer.com
www.proskauer.com

Carlos Velez
Managing Attorney, Law Enforcement Bureau
New York City Commission on Human Rights
22 Reade Street, 3rd Fl.
New York, New York 10007

RE:   **Deborah Aschheim v. New York City Economic Development Corporation,
Complaint No.: M-E-A-17-24252**

Dear Mr. Velez:

Respondent, the New York City Economic Development Corporation (the "NYCEDC"), submits
this position statement in response to the above-referenced Charge of Discrimination filed by
Deborah Aschheim.[1]  Contrary to the Charge's allegations, the NYCEDC did not unlawfully
discriminate against Ms. Aschheim on the basis of her age.

As discussed in detail below, Aschheim was not hired by the NYCEDC because she did not have
the appropriate job experience for the positions she applied to.  Aschheim came to the NYCEDC
as an executive, with a legal and insurance background who had worked in an established
insurance program development and management role for many years.  The positions at
NYCEDC, however, required extensive risk management experience, as well as the skill set to
work as a department of one, broker new relationships and and establish a leadership position
where none had previously existed.  Aschheim's credentials, while impressive, were simply not
the right match.

Not only is there ample evidence to support the NYCEDC's legitimate, non-discriminatory
reason for not hiring Aschheim, there is absolutely no evidence that Aschheim's age played any
role in the NYCEDC's decision-making process.  First, the individual who made the decision to
pass upon Aschheim's application had no knowledge of Aschheim's age and was 58 years old
herself.  Furthermore, prior to rejecting Aschheim's application, she had been brought back to
the NYCEDC for multiple rounds of interviews, for two separate positions.  Aschheim was a
heavily considered candidate, just ultimately not the right candidate.  Lastly, Aschheim's Charge
is based on nothing more than her own speculation and conclusory statements, neither of which
can be used to establish a claim for discrimination.  The NYCEDC submits that the instant

---

[1]  Although believed to be true based on the facts presently known to the NYCEDC, this position statement is being
submitted for investigation purposes only and is not to be used as evidence in any judicial or administrative
proceeding.  By submitting this position statement, the NYCEDC does not waive its right to present new, different,
or additional facts or arguments at any subsequent stage of proceedings, and unless expressly admitted herein, the
NYCEDC denies the allegations in the Charge.  The NYCEDC respectfully requests that this position statement be
treated as confidential and not disclosed to any third party without advance notice to the NYCEDC.

Beijing | Boca Raton | Boston | Chicago | Hong Kong | London | Los Angeles | New Orleans | New York | Newark | Paris | São Paulo | Washington, DC

October 27, 2017
Page 2

Charge of Discrimination has no merit and should be dismissed with a finding of "no probable cause."

## STATEMENT OF RELEVANT FACTS

### I. Background

The NYCEDC is a not-for-profit provider of economic development services for New York City. The NYCEDC champions a broad range of initiatives designed to modernize the City's infrastructure, develop stronger neighborhoods, improve quality of life in underserved communities and stimulate employment growth by encouraging investment throughout each of New York City's five boroughs. The NYCEDC's mission is to "create shared prosperity across New York City's five boroughs by strengthening neighborhoods and growing good jobs."

With these principles as the backdrop for its mission, the NYCEDC is committed to being an equal employment opportunity employer. Its policies prohibit discrimination against applicants and/or employees because of a protected status, including age. *See Exhibit 1.* As stated in the NYCEDC's Equal Employment Opportunity Program and Anti-Harassment Policy:

> NYCEDC's Equal Employment Opportunity (EEO) Policy was created to provide equal opportunity for all employees and applicants for employment by ensuring an environment from off illegal discrimination, including harassment, based on protected categories including race, creed, color, national origin, religion, sex, age, disability, alienage or citizenship status, marital status...

*Id.* This policy is reiterated in its employment postings. There is simply no dispute that the NYCEDC prohibits discrimination in the workplace, including with respect to its applicants, and requires its employees abide by its policies at all times.

### II. The NYCEDC's Employment Application Process

The NYCEDC posts all open positions on its website. Each posting, which identifies the position's responsibilities and requirements, allows interested applicants to submit an online application directly through the NYCEDC's website.

The online application consists of basic identifying information questions, including the applicant's name, address, e-mail address, desired salary, veteran status and a "yes or no" question to confirm that the applicant is age 18 or older. The application does not otherwise ask for the applicant's age or date of birth. The applicant is also asked to submit a resume, cover letter, personal and business references and any other documentation that the applicant would like to have considered with the application.

Once an application is submitted, it is retrieved by the NYCEDC's recruiting team which fields applications and resumes for 30-40 positions at any given time. A member of the NYCEDC's

October 27, 2017
Page 3

recruiting team reviews each application to determine whether the applicant meets the postings minimum requirements.

If a job applicant possesses the necessary qualifications, the applicant is screened through a phone interview with the recruiter. If the applicant passes the initial phone interview, he/she will be invited to the NYCEDC office for an in-person interview with members of the management team for that position. Successful candidates are passed on to a member of the Executive team who makes the final hiring decision.

## III. Aschheim's First Application to the NYCEDC

On or about February 25, 2016, the NYCEDC, through its website, listed a job posting for a newly created position, "Director – Risk Management and Insurance." It was a director-level position, reporting to the Corporate Comptroller. The position's primary responsibility was "the development, delivery and oversight of the NYCEDC's insurance and risk management programs by establishing industry best practices in line with regulatory requirements." As a newly created position within the NYCEDC organization, the position had a heavy internal customer service component to it. A successful candidate would be expected to liaison with different departments in the organization that otherwise would not have interaction with Risk Management and Insurance, in order to establish the Director's responsibility for oversight of the NYCEDC's insurance and risk management program and to address any related issues within those departments. As specifically stated in the posting, the Director would be responsible for "setting the strategic risk management vision and delivering the strategy to the company using exceptional leadership skills, network of internal and external alliances and highly developed business skills."

Aschheim applied to the Director position on March 8, 2016 through the NYCEDC's website. Her application was reviewed by Orit Shani, a member of the NYCEDC's recruiting team, who determined that Aschheim's application met the minimum experience requirements for the position and invited Aschheim to participate in an initial phone interview. Shani had no knowledge of Aschheim's age at the time of the interview.

Aschheim successfully passed the phone interview and was invited for an in-person interview with Fred D'Ascoli, Comptroller, Sr. Vice President in Finance and the direct manager for the position, as well as John McGlynn, Vice President, Revenue, Lease Analysis & Insurance.

On or about March 23, 2016, Aschheim met with D'Ascoli and McGlynn. The interview went well. D'Ascoli and McGlynn were impressed by Aschheim's legal and compliance background and the high-level positions that she had held at her prior employers. D'Ascoli did, however, have some concerns that Aschheim lacked the requisite risk management experience necessary for the position. While Aschheim identified herself as a "risk manager" on her resume, her experience appeared to be more legal and compliance related. D'Ascoli also had concerns as to whether Aschheim's prior work experience was a good fit for the Director position, which was essentially a start-up position that would function within the organization as a department of one – something that stood out as very different from Aschheim's prior experience. Aschheim spoke

October 27, 2017
Page 4

at length about her experience in managing teams within an already-established organizational structure. The Director position, however, was a start-up position and required someone to create and define the position within other departments of the organization.

Despite D'Ascoli's concerns, he and McGlynn determined that Aschheim should meet with NYCEDC's Chief Financial Officer, Kim Vacarri. At the time D'Ascoli and McGlynn invited Aschheim back for a third interview, neither knew her age. D'Ascoli was 64 years old. McGlynn was 55 years old.

On April 20, 2016, Vacarri met with Aschheim. While Vacarri saw some strengths in Aschheim's candidacy, namely her insurance and compliance knowledge and her prior experience in a director-level position, Vacarri had the same concerns as D'Ascoli, including Aschheim's lack of risk management experience and lack of skills to establish the position and broker the necessary relationships. The Director – Risk Management and Insurance position was akin to a chief risk management position, however, Aschheim's experience was more legal and insurance based. In addition, Aschheim did not have any experience in establishing a position from scratch and building a department. Rather, her experience was in stepping into an already-established executive functions. In fact, when Vaccari asked Aschheim how she would establish the Director role and build a rapport with the other departments, she could not answer the question. She similarly struggled to answer why she was interested in leaving a CEO role with an already-established team to become a department of one. It was clear to Vacarri that Aschheim, like many others, was not a good fit for the position. Vaccari, who is 58 years old, had no knowledge of Aschheim's age at the time of her interview.

NYCEDC searched for a candidate for the Director – Risk Management and Insurance position for more than six months. The organization received 256 applications for the position, only 23 of which passed the initial screening and were invited for an in-person interview. Of those 23, nine individuals were called back for a second in-person interview, one of whom was Aschheim. Over the course of the six-month job-posting, the NYCEDC saw many candidates with insurance and compliance backgrounds and high-level executive experience, much like Aschheim. However, they did not find a candidate that was qualified to fill their specific need for a candidate with insurance and risk management knowledge, who also had experience in building a department from the ground up. The NYCEDC revised the Director job posting on two occasions (3/25/16 and 6/1/16) to try and elicit more qualified candidates, but their efforts were to no avail. In fact, the organization started seeing repeat applications from candidates who had previously been rejected, including Aschheim. Accordingly, on October 4 2016, the NYCEDC removed the posting and the Director position remained unfilled.

## IV.  Aschheim's Second Application to NYCEDC

After much consideration and internal discussion, NYCEDC decided to revamp the previously posted Director position. Since the organization was unable to find a candidate that was qualified to take-on what was akin to a chief risk management position, it was decided that the position would be downgraded from a director-level position to a manager-level position. The new position, which was titled "Insurance & Risk Manager – Accounting" would report to the

October 27, 2017
Page 5

Vice President, Revenue, Lease Analysis & Insurance in the Accounting Department, as opposed to the Comptroller. The new position shared many of the same responsibilities as the prior Director posting, including "manage[ment] of all corporate wide insurance coverage," "manage[ment] [of] internal captive insurance company," "manage[ment] [of] external relationships with third party administrators" and "coordinating all insurance and risk related requests from internal stakeholders," however, it would operate on a lower level.

In or around February 2017, NYCEDC posted the new position, Insurance & Risk Manager – Accounting, on its website. Aschheim applied for the position through the NYCEDC's website. Shani contacted Aschheim for an initial screening interview. For the same reasons that Aschheim was considered for the Director position, she was invited for an initial interview for the Insurance & Risk Manager – Accounting position. Aschheim came in to meet with McGlynn, who would be the direct supervisor for this lower-level position. McGlynn passed Aschheim through the first round interview and Aschheim was scheduled for a second interview several weeks later. However, when the second round interview candidates were presented to Vaccari, who would be making the final selection decision, she knew from her prior interview with Aschheim that Aschheim did not possess the requisite risk management experience and cancelled the interview.

## V.   The NYCEDC'S Selection of a Candidate with the Relevant Employment Experience

The Insurance & Risk Manager – Accounting position was ultimately filled on May 22, 2017. The posting received 98 applications and nine individuals were brought-in for an in-person interview, including Aschheim. The individual who was selected for the position, a female candidate in her mid-30's, had five years of prior experience working in a not-for-profit arts department as an outsourced risk manager and three years of prior experience working as a risk analyst. She also had experience working at a small, start-up brokerage firm, which provided the necessary insurance background.

## THE CHARGE FAILS TO STATE A VIABLE CLAIM OF DISCRIMINATION AS A MATTER OF LAW

## I.   Aschheim Has Failed to Establish A *Prima Facie* Case of Discrimination.

Discrimination claims brought under the ADEA are analyzed under the burden-shifting framework originally set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). See also, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 168–69 (2000); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981). Under this framework, Aschheim has the initial burden of showing that: (i) she was a member of a protected class; (ii) she was qualified for the position; (iii) she suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. Discrimination claims brought under the New York City Human Rights Law are analyzed under the "mixed-motive" framework. Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 127 (1st Dep't 2012). Under the "mixed-motive" analysis, "the employer's production of evidence of a legitimate reason for the

October 27, 2017
Page 6

challenged action shifts to the plaintiff the lesser burden of raising an issue as to whether the action was 'motivated at least in part by . . . discrimination.'" *Id.* at 127 (internal citations omitted). "[T]he burden of persuasion of the ultimate issue of discrimination always remains with the plaintiff." *Id.* at 114.

Aschheim cannot establish that she was qualified for the position, nor that the circumstances under which she was not selected give rise to an inference of discrimination or that Respondent was motivated "at least in part" by discrimination. Several key facts establish that the NYCEDC did not discriminate against Aschheim. First, Aschheim did not have the requisite risk management work experience for the posted positions. Furthermore, when asked, Aschheim could not articulate how she would establish the Director role and build relationships with the other departments, which was expected of a qualified candidate.

Even if Aschheim was able to show that she was qualified for the position – which she cannot – the one alleged statement that she offers in support of her claims is insufficient to establish an inference of discrimination as a matter of law. In her Charge, Aschheim alleges that during the April 20, 2016 interview for the Director position, "she was asked how she would feel about reporting to someone with less experience than she had or who was younger than her." As an initial matter, NYCEDC denies that such a comment was ever made. In fact, the comment is nonsensical in the context in which Aschheim alleges it occurred. Aschheim states that the comment was made during her interview for the Director position. However, the individual who was the Comptroller at the time, (and the individual who Aschheim would report to) is 64 years old, two years older than Aschheim.

Given that the only basis upon which Aschheim tries to establish her claim is the this comment, her allegations are woefully insufficient. The indisputable evidence demonstrates that Vacarri denied Aschheim's application because she did not possess the requisite experience. Without evidence that Vacarri or anyone at the NYCEDC considered Aschheim's age as a factor in the selection process, Aschheim's speculation and conclusory statement simply cannot establish a claim for discrimination. See Adams v. Debevoise & Plimpton, 2004 WL 1737826, at *6 (S.D.N.Y. Aug. 3, 2004) (rejecting discrimination claim where plaintiff "introduce[d] no additional evidence, beyond his own unfounded, speculative, and conclusory allegations").

Relatedly, when the supervisor making the employment decision is in the same protected class as the complainant, there is a strong inference against finding any discriminatory intent on the part of that decision-maker. See Connell v. Consol. Edison Co. of New York, 109 F. Supp. 2d 202, 209 (S.D.N.Y. 2000) (granting summary judgment on employee's ADEA claim, in part, because all of the people involved in the decision to terminate plaintiff's performance were in the same protected age class as the plaintiff); Hanna v. New York Hotel Trades Council, 18 Misc. 3d 436, 440, 851 N.Y.S.2d 818, 823 (Sup. Ct. N.Y. Cty 2007) (summary judgment granted on discrimination and retaliation claims, in part, because the decision-maker was a member of the same protected class as the plaintiff). All of the individuals who interviewed Aschheim and contributed to the hiring decision are over age 50, including D'Ascoli (64 yrs), McGlynn (55 yrs) and Vacarri (58 yrs). In fact, Vacarri, the individual who made the decision to pass upon

October 27, 2017
Page 7

Aschheim's application is 58 years old, is not only in the same protected class as Aschheim but is virtually the same age.

## II.    Aschheim's Allegations Are Insufficient to Rebut Legitimate, Non-Discriminatory Reason for Non-Selection

Even if Aschheim could establish a *prima facie* case of discrimination, which she cannot, her claims would ultimately fail because she can present no evidence to rebut the legitimate, non-discriminatory business reason that the NYCEDC has articulated for rejecting her application.[2]

As discussed above, there is simply no evidence that the NYCEDC's legitimate business reason for not selecting Aschheim for the open Director and Manager positions, namely lack of risk management experience and the preference for a very highly qualified candidate, is a pretext for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–10 (1993). Aschheim's Charge amounts to nothing more than a request that the Commission second-guess the NYCEDC's justifiable business decision. But the role of administrative agencies enforcing anti-discrimination laws "is to prevent unlawful [employment] practices, not to act as a super personnel department that second guesses employers' business judgments." Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2001) (quoting Byrnie v. Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001)).

## CONCLUSION

For all the reasons stated above, the NYCEDC respectfully requests that the Division dismiss the Charge of Discrimination in its entirety.

Respectfully submitted,

Edna D. Guerrasio

---

[2] Under the McDonnell Douglas Corp. v. Green framework, if the plaintiff establishes a *prima facie* case, the defendant must articulate – but need not prove – a legitimate, non-discriminatory reason for the decision. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (explaining that defendant's burden is one of production, not persuasion). Once the defendant produces a legitimate reason for its decision, the plaintiff must advance sufficient evidence on which a reasonable jury could conclude that the stated reason is false or a pretext for discrimination and that it is more likely than not that plaintiff was denied the sought-after position because of race discrimination. See St. Mary's Honor Ctr., 509 U.S. at 515; James v. N.Y. Racing Ass'n, 233 F.3d 149, 154, 157 (2d Cir. 2000).

# Exhibit 1

Aschheim vs NYCEDC  21


New York City Economic Development Corporation

## Policy No. 1.1 Equal Employment Opportunity Program and Anti-Harassment Policy

### Non-Discrimination and Equal Employment Opportunity

NYCEDC's Equal Employment Opportunity (EEO) Policy was created to provide equal opportunity for all employees and applicants for employment by ensuring an environment free of illegal discrimination, including harassment, based on protected categories including race, creed, color, national origin, religion, sex, (including "gender identity" – which refers to a person's actual or perceived sex, and includes self-image, appearance, behavior or expression, whether or not different from that traditionally associated with the legal sex assigned to the person at birth), age, disability, alienage or citizenship status, marital status, caregiver status, prior record of arrest or conviction, genetic predisposition (having something in your genes which increases the risk of your having a disease or disability), carrier status (having something in your genes which increases the risk of your children having a disease, even though you do not have it yourself), sexual orientation, or being a victim of domestic violence (hereafter the preceding list will be referred to as protected categories).

NYCEDC's EEO Policy provides an opportunity for employees and applicants for employment to report discrimination and also protects them from retaliation when they make EEO complaints or cooperate in EEO investigations.

### Anti-Harassment Policy

All NYCEDC employees have a right to work in an environment free from all forms of discrimination including harassment. Consistent with NYCEDC's respect for the rights and dignity of each employee, harassment based on protected categories or any other characteristic or status protected under federal, state or local law will not be sanctioned nor tolerated by NYCEDC. All employees should, therefore, be aware that all forms of harassment and discrimination based on any protected class or status are strictly prohibited. Supervisors and managers are responsible for assuring that no employee is subjected to conduct that constitutes sexual or any other form of harassment. Any individual found to have engaged in sexual or any other form of harassment or discrimination will be disciplined as deemed appropriate, up to and including termination.

### Definitions of Harassment

**Sexual Harassment:** Sexual harassment constitutes discrimination and is illegal under federal, state and local laws. For the purpose of this policy, sexual harassment is defined, consistent with the EEO Guidelines, as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when, for example: (i) submission to such conduct is made, either explicitly or implicitly, a term or condition of an individual's employment; (ii) submission to or rejection of such conduct is used as the basis for employment decisions affecting such individual; or (iii) such conduct has the purpose or effect of unreasonably interfering with the individual's work performance or creating an intimidating, hostile, or offensive work environment.

Sexual harassment may include a range of subtle and not so subtle behaviors and may involve individuals of the same or different gender. Depending on the circumstances, these behaviors may include, but are not limited to: unwanted sexual advances or requests for sexual favors; sexual jokes and innuendo, verbal abuse of a sexual nature; commentary about an individual's

Aschheim vs NYCEDC  22

body, sexual prowess or sexual deficiencies; leering, catcalls or touching; insulting or obscene comments or gestures: display or circulation in the workplace of sexually suggestive objects or pictures (including through e-mail); and other physical, verbal or visual conduct of a sexual nature. Sex-based harassment – that is, harassment not involving sexual activity or language (e.g. male manager yells only at female employees and not males) may also constitute discrimination if it is directed at employees because of their sex.

**Other forms of harassment:** Harassment on the basis of any other protected categories is also strictly prohibited. Under this policy, harassment is verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his/her, or his/her relatives', friends', or associates' protected category or any other characteristic or status protected under federal, state or local law, and that: (i) has the purpose or effect of creating an intimidating, hostile, or offensive work environment; (ii) has the purpose or effect of unreasonably interfering with an individual's work performance; or (iii) otherwise adversely affects an individual's employment. Harassing conduct includes, but is not limited to: epithets, slurs, or negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes and display or circulation in the workplace of written or graphic material that denigrates or shows hostility or aversion toward an individual or group (including through e-mail).

## Application

These policies of EEO and prohibition of discrimination and harassment apply to all applicants and employees, and prohibit harassment, discrimination and retaliation whether engaged in by a coworker, a supervisor or manager or by someone not directly connected to NYCEDC (e.g., outside vendors, consultants or contractors). Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting outside the workplace, such as during business trips, meetings, and business-related social events.

## Management Duties

All managers are charged with making a personal commitment to practice and enforce the principles of this policy as follows:

- Recruit, hire, train and promote for all job positions without regard to protected categories or any other characteristic or status protected under federal, state or local law.
- Ensure that decisions on employment are in accordance with the principles of EEO.
- Ensure that promotion decisions are in accordance with principles of EEO by imposing only valid requirements for promotional opportunities.
- Ensure that all personnel actions such as compensation, transfer, layoff, corporate-sponsored training and education will be administered without regard to protected category or any other characteristic or status protected under federal, state or local law.
- Ensure that relations among staff are void of any verbal or physical abuse, intimidation or harassment against any employee or applicant for employment on the basis of protected category or any other characteristic or status protected under federal, state or local law.

## Complaint Procedure

Any employee who believes that he or she has been the subject of discrimination, any form of harassment or retaliation by anyone at NYCEDC or by any person who does business with NYCEDC, should, and is encouraged to, report the act immediately to his or her supervisor, or to the NYCEDC Equal Employment Officer, the Senior Vice President of Human Resources.

Individuals should not feel obligated to file their complaints with their immediate supervisor first before bringing the matter to the attention of the NYCEDC EEO Officer or Human Resources.

To the extent consistent with adequate investigation and appropriate corrective action, complaints will be treated as confidential. A prompt and thorough investigation of complaints will be conducted and appropriate corrective action will be taken if warranted. The investigation may include individual interviews with the parties involved and, where necessary, with individuals who may have observed the alleged conduct or may have other relevant knowledge.

Corrective action may include, for example, disciplinary measures such as warning, withholding of a promotion or pay increase, re-assignment, suspension without pay and termination, as NYCEDC believes appropriate under the circumstances. It may also include, training and/or coaching, referral to counseling, monitoring of the offender.

Early reporting and intervention have proven to be the most effective method of resolving actual or perceived incidents of harassment, discrimination or retaliation. Therefore, while no fixed reporting period has been established, NYCEDC strongly urges the prompt reporting of complaints or concerns so that rapid and constructive action can be taken. NYCEDC will make every effort to stop the alleged harassment, discrimination or retaliation, but can only do so with the cooperation of employees.

The availability of these complaint procedures does not preclude individuals who believe they are being subjected to unlawful conduct from promptly advising the offender that his or her behavior is unwelcome and requesting that it be discontinued. However, notifying the offender does NOT constitute a complaint under this policy. An employee should notify someone other than the offender in order to make a complaint under this policy. Any supervisor or manager who receives a report or otherwise becomes aware of possible discrimination, harassment, or retaliation should promptly advise Human Resources.

To make a complaint, please fill out the Complaint form located on the Forms and Requests section on EDCis and submit it to Human Resources.

Employees may also file a complaint with the following government entities:

- NYC Commission on Human Rights: 40 Rector Street New York, NY 10006 - 10th Floor Phone: (212) 306-5070

- NYS Division of Human Rights – 163 W 125th street - 4th Floor New York, NY 10027 Phone: (212) 961-8650

- Equal Employment Opportunity Commission (EEOC) – NY District Office 33 Whitehall Street 5th Floor, New York, NY 10004 Phone: (800) 669-4000

Effective July 1, 2016

Aschheim vs NYCEDC  24

## Non-Retaliation

NYCEDC prohibits retaliation and will not in any way retaliate against an employee, potential employee, or former employee who, in good faith, makes a complaint or report of harassment or discrimination, or participates in the investigation of such a complaint or report. Retaliation against any individual for in good faith reporting a claim or cooperating in the investigation will not be tolerated and will itself be subject to appropriate discipline.

## Mandatory Training

To enhance and reinforce this policy, all NYCEDC staff and managers are regularly required to complete an online course on EEO and Harassment. At the conclusion of the training, employees must print the certificate of completion and submit it to their Human Resources Business Partner. This certificate is placed in the personnel folder as an official record of completion.

Additionally, all new employees are required to complete the below noted training as a part of their onboarding. At the conclusion of the training, employees must print the certificate of completion and submit it to their Human Resources Business Partner. This should be done no later than one week from their date of hire. This certificate will be placed in their personnel folder.

1. All new employees (non-managers) will receive a link to the below on-line training programs and will be tested on the material at the end of the training:

   - **EEO and Preventing Unlawful Discrimination for Non-Managers**

   - **Preventing Workplace Harassment for Employees**

2. All new employees (managers) will receive a link to the below on-line training programs and will be tested on the material at the end of the training:

   - **EEO and Preventing Unlawful Discrimination for Managers**

   - **Preventing Workplace Harassment for Managers**

If you have any questions about this policy or the training, please contact the Human Resources Department.

CITY OF NEW YORK
COMMISSION ON HUMAN RIGHTS

-----------------------------------------------------------X

In the matter of the Complaint of:

DEBORAH ASCHHEIM,

                Complainant,

          -against-

NEW YORK CITY ECONOMIC
DEVELOPMENT CORPORATION

                Respondent.

-----------------------------------------------------------X

Complaint No.: M-E-A-17-24252
Federal Charge No. 16F-2017-00353C

**VERIFIED ANSWER**

Respondent New York City Economic Development Corporation (hereinafter referred to as the "NYCEDC" or "Respondent"), through its attorneys Proskauer Rose LLP, states by way of its Answer to the Verified Complaint of Complainant Deborah Aschheim ("Complainant") as follows:

1.     Respondent denies knowledge of information sufficient to form a belief as to the truth of the allegations in Paragraph 1 of the Complaint concerning Complainant's age, but otherwise admits that according to its business records, Complainant's home address at the time of her application to NYCEDC was 383 West End Avenue, New York, New York, 10024.

2.     The allegations contained in Paragraph 2 of the Complaint concern legal conclusions, to which Respondent is not required to make a response. Respondent admits that its address for service of process is 110 William Street, New York, New York 10038.

3.     Respondent admits the allegations contained Paragraph 3 of the Complaint.

4.     Respondent denies the allegations contained in Paragraph 4 of the Complaint, excepts admits that after submission of her application on March 8, 2016, Complainant was

contacted by NYCEDC employee Orit Shani for a phone interview, after which Complainant was invited to the NYCEDC's office for an in-person interview.

5.   Respondent denies the allegations contained Paragraph 5 of the Complaint, except admits that Complainant interviewed with Orit Shani, John McGlynn and Fred D'Ascoli at NYCEDC's offices on March 22, 2016.

6.   Respondent denies the allegations contained Paragraph 6 of the Complaint, except admits that Complainant had a second in-person interview at NYCEDC's offices on or about April 20, 2016 with Spenser Hobson and Kim Vaccari.

7.   Respondent denies the allegations contained Paragraph 7 of the Complaint.

8.   Respondent denies the allegations contained Paragraph 8 of the Complaint.

9.   Respondent admits the allegations contained Paragraph 9 of the Complaint.

10.   Respondent denies knowledge or information sufficient to form a belief as to what Complainant "saw" in February 2017 and denies the remainder of the allegations contained Paragraph 10 of the Complaint, except admits that in February 2017, NYCEDC posted a new job opening for an "Insurance & Risk Manager - Accounting" position.

11.   Respondent denies the allegations contained Paragraph 11 of the Complaint, except admits that in February 2017 Complainant applied to the newly posted position of "Insurance & Risk Manager - Accounting" and had a phone conversation with the recruiting team at NYCEDC regarding the new position.

12.   Respondent denies the allegations contained Paragraph 12 of the Complaint, except admits that in March 2017, Complainant met with John McGlynn for an in-person interview for the "Insurance & Risk Manager - Accounting" position.

2

13. Respondent denies the allegations contained in Paragraph 13 of the Complaint, except admits that NYCEDC's recruiting team contacted Complainant to schedule a second interview.

14. Respondent admits the allegations contained in Paragraph 14 of the Complaint.

15. Respondent denies the allegations contained in Paragraph 15 of the Complaint.

16. Respondent denies the allegations contained in Paragraph 16 of the Complaint.

WHEREFORE, Respondent asks that the Verified Complaint be dismissed in its entirety.

Dated: New York, New York
October 27, 2017

PROSKAUER ROSE LLP

By:_____
Edna D. Guerrasio
One Newark Center
Newark, New Jersey 07102
973.274.3200
eguerrasio@proskauer.com
*Attorneys for Respondent*

CITY OF NEW YORK
COMMISSION ON HUMAN RIGHTS

-----------------------------------------------------X

In the matter of the Complaint of:

DEBORAH ASCHHEIM,

          Complainant,

       -against-

NEW YORK CITY ECONOMIC
DEVELOPMENT CORPORATION

         Respondent.

-----------------------------------------------------X

Complaint No.: M-E-A-17-24252
Federal Charge No. 16F-2017-00353C

**VERIFICATION**

STATE OF NEW YORK     )
                           ) ss.
COUNTY OF NEW YORK  )

NUPUR TALWAR, being duly sworn, states:

I am the Vice President of Human Resources at the New York City Economic Development Corporation. I have read the foregoing Verified Answer and know the contents thereof. The same is true to my own knowledge or the knowledge of others or based on company records, except as to the matters therein stated to be alleged on information and belief; and as to those matters I believe them to be true.

                                     NUPUR TALWAR

Sworn to before me this 26th
day of October 2017.

Notary Public

LYNDELL R WRIGHT
NOTARY PUBLIC-STATE OF NEW YORK
No. 01WR6254072
Qualified in Richmond County
My Commission Expires January 09, 20 21

4

Exhibit C

Aschheim Vs. New York City Economic Development Corporation (NYCEDC)

III.E   Supplement Materials

Exhibit C - Plaintiff Rebuttal (December 11, 2017) to NYCCHR

# Deborah S. Aschheim

383 West End Avenue
New York, NY  10024
Tel. 917.882.9949
debaschheim@gmail.com

December 11, 2017

NYC Commission on Human Rights
22 Reade Street - First Floor
New York, NY 10007
Attn:  Mr. Conor Ahern

## CONFIDENTIAL Rebuttal of Complainant

**Aschheim vs. New York City Economic Development Corporation**
**NYCCHR Reference No.:  M-E-A-17-24252**

Dear Mr. Ahern:

This Rebuttal is submitted by Deborah S. Aschheim, the Complainant, to the Answer dated October 27, 2017 of The New York City Economic Development Corporation ("NYCEDC") and the letter dated October 27, 2017 (the "Proskauer Letter") of its counsel, Proskauer Rose, LLP ("Proskauer") in connection with the above referenced matter (collectively, the "Answer").

Essentially NYCEDC claims that I was not qualified for the position of Director – Risk Management & Insurance (the "Position"), that the person who was ultimately hired was more qualified for the Position than I, and that age did not play a role in the NYCEDC's decision-making process. **For the reasons set forth below, NYCECD's Answer is simply _not_ supported by the facts and does _not_ support a conclusion that I was not the victim of age discrimination.  Moreover NYCECD's Answer provides additional evidence that I was substantially more qualified than the younger candidate hired.  Therefore, I respectfully request that the Commission complete its investigation into this matter and issue a Determination of Probable Cause, and refer this matter to the Office of Administrative Trials and Hearings (OATH) for a trial.**

References in this Rebuttal are to the Proskauer Letter, a marked copy of which is attached hereto as **Exhibit A**.

I.       <u>NYCEDC's claim that Ms. Aschheim was not qualified for the Position</u>

**NYCEDC Answer (selected points – from Proskauer Letter – Exhibit A):**

1-A     "The positions at NYCEDC, however, required extensive risk management experience, as well as the skill set to work as a department of one, broker new relationships and [sic] establish a leadership position where none had previously existed.  Aschheim's credentials, while impressive, were simply not the right match."

1-B    "It was a director-level position, reporting to the Corporate Comptroller. The position's primary responsibility was "the development, delivery and oversight of the NYCEDC's insurance and risk management programs by establishing industry best practices in line with regulatory requirements."

1-C    "As a newly created position within the NYCEDC organization, the position had a heavy internal customer service component to it. A successful candidate would be expected to liaison with different departments in the organization that otherwise would not have interaction with Risk Management and Insurance, in order to establish the Director's responsibility for oversight of the NYCEDC's insurance and risk management program and to address any related issues within those departments. As specifically stated in the posting, the Director would be responsible for "setting the strategic risk management vision and delivering the strategy to the company using exceptional leadership skills, network of internal and external alliances and highly developed business skills.""

**Rebuttal: As indicated by my resume (Exhibit B) and as I presented in detail during my interviews, I had significant and directly relevant/on-point experience for the Position. Based upon the Proskauer Letter, I had significantly more qualifications than the hired individual.**

1.    During my interviews and in my Resume, which was submitted prior to the interviews, I described in detail my 8+ years of extensive and relevant experience as a risk manager in both the public and private sectors, with projects and risks that were similar to those that the NYCEDC addresses with its projects and constituents. In particular, I articulated my responsibilities and accomplishments at NRMC and at FOJP. I described how I had successfully transitioned from a lawyer to an integrated, fully credentialed risk manager (ARM/ERM/A-ERM). I described my leadership skills and my accomplishments.

2.    During my interviews, I explained that NRMC was a start-up when I joined in February 2012 as its first Executive Director and its only employee. (I am still NRMC's only employee and ED.) I created the position and built the multiple relationships needed to successfully provide risk management services. I explained that NRMC is a not-for-profit funded by a grant from the Federal government. NRMC is the risk manager for more than 45 not-for-profit organizations throughout the United States that develop, own, operate or service affordable housing, covering commercial properties and more than 25,000 residential units with a total insured value in excess of $2.7 billion. Its captive structure and operation, as well as its goals and projects, are very similar to those of NYCEDC. During my interviews we discussed the scope of coverages impacting the constituents of NRMC and the NYCEDC Program: Property, Casualty/GL, construction and builders' risk, environmental, hurricane/wind/earth movement, cyberrisk and D&O, and the risks relating to public projects and public/quasi-public entities such as the constituents of NRMC, FOJP and NYCEDC. The similarities between NRMC and NYCEDC are many. Those who interviewed me acknowledged the direct relevance of my experiences to the Position.

During my interviews, I also detailed the legacy issues I faced when I joined NRMC in 2012, and how I addressed and resolved those issues. I described how, during my tenure, NRMC grew in membership size and was as large as 65 member organizations, with a total insured value of $3-6 billion in 22 States, and with an annual insurance premium of almost $15 million.

2

3.        During my interviews, I recounted how I alone established a leadership position at NRMC and led all aspects of the organization from February 2012 to present. I articulated how I single-handedly established and defined the ED/RM position for NRMC – "as a department of one" and "where none had previously existed". I described how I defined, created and successfully implemented the strategic risk management vision and insurance program (underwriting criteria and coverage terms) to the NRMC membership. I was asked how I would transition to the NYCEDC organization. I described in detail how I would develop the role of Director and interface with the various departments and constituents of NYCEDC, which I then memorialized in a 90-day on-boarding plan (**Exhibit C**; the "Plan") that I shared with the recruiting team. I also reported on a proprietary emergency preparedness (resiliency) app that I developed for NRMC members and could design for NYCEDC and its constituents. Various members of NYCEDC told me during my interviews that the Plan and the app that I proposed were directly relevant to the position and would be very helpful to NYCEDC and its constituents.

4.        During my interviews, I also elaborated on my 4+ years of risk management experience at FOJP Service Corp. ("FOJP"). I explained that FOJP manages a multi-billion dollar captive insurance/risk management program for NYC area medical centers, including the Mt. Sinai system, Montefiore, North Shore - LIJ (now Northwell) and Maimonides, as well as a host of social services agencies, all under the auspices of UJA-Federation. FOJP has been in operation since 1975 and provides complete insurance services for MedMal, GL, Property, environmental, CyberRisk, fidelity, D&O, E&O. In addition to my legal responsibilities, I described how I was integrated into the risk management team and was actively involved in risk management programs for our members, ranging from captive management and compliance, insurance underwriting, broker and carrier relations and policy issuance, claims management to the administration and delivery of risk management initiatives to all constituents (from hospital CEOs, physicians and agency EDs to maintenance staff.) We also discussed my captive insurance experience. Those who interviewed me acknowledged the relevance of my captive experiences to the Position and the captive insurance company NYCEDC had recently formed.

5.        During my interviews, I also explained in detail how I interfaced with the NRMC and FOJP Boards of Directors, our sponsors (for NRMC, NeighborWorks America and for FOJP, UJA-Federation) and constituent members (insureds) and their teams, as well as the insurance markets (brokers, insurance carriers, reinsurers, TPAs, adjusters, auditors, regulators, captive managers and construction professionals/vendors). I also described in detail the tasks, benchmarks and reports (analytics) I have successfully employed to implement my strategic vision at NRMC and FOJP. I also described the impact of tax credits on the constituent members of NRMC and their insurance needs, which I was told was similar to the tax credit issues that NYCEDC constituents might face. We discussed captive insurance companies and my extensive experience in this area and the captive that NYCEDC was forming around the time of my first round of interviews.

6.        During my interviews, I described in detail how I developed and implemented risk management analytics/metrics and benchmarking (with an emphasis on loss ratio measures and performance dashboards and reports) to NRMC members who lack their own internal resources to address risk management. I described the risk management workshops I developed and conducted. I explained how NRMC members rely upon the reports I developed and circulated to educate their own constituents (their boards, executive staff, residents, members of the public at large, funders and investors, and regulators) on the importance of a robust risk management program for their organizations.

3

I provided examples of how I would employ similar resources and programs for NYCEDC and its constituents.

    7.    During my interviews, I detailed how I interface with insurance markets: insurance brokers, new relationships (prospects) and insured members (ranging from the Executive Directors of our members to their maintenance staff) at NRMC and at FOJP. I recounted how I increased participation in the NRMC Program, as well as its profitability. I showed how I successfully lowered the cost of risk of our members.

**II.**    **NYCEDC's claim that Ms. Aschheim's age did not play any role in the NYCEDC's decision-making process**

**NYCEDC Answer (selected points – from Proskauer Letter – Exhibit A):**

2-A    "[T]here is absolutely no evidence that Aschheim's age played any role in NYCEDC's decision making process."

2-B    "First, the individual who made the decision to pass upon Aschheim's application had no knowledge of Aschheim's age and was 58 years old herself."

2-C    "At the time D'Ascoli and McGlynn invited Aschheim back for a third interview, neither knew her age."

2-D    "Vaccari [sic], who is 58 years old, had no knowledge of Aschheim's age at the time of her interview."

**Rebuttal: This is not true. Age definitely played a role in my application. The dates of my credentials are featured in my resume (Exhibit B). Each person that interviewed me possessed and referred to my resume during the interview. My resume clearly establishes that I obtained my professional degrees in 1981 and then began work, as well as my dates of employment. My age was known to all at NYCEDC that saw my resume.**

    1.    My resume includes my age because my dates of education and employment are on my resume. The math is easy and obvious. Each person I met with at NYCEDC knew my age as they each had a copy of my resume – with the dates – in front of them during my interviews. In addition, a search of public records for my license as an attorney includes my date of admission to the NY Bar: 1982[1].

    2.    NYCEDC's position that people who interviewed me are in their 50's or 60's does not negate a conclusion that age played a role in the NYCEDC decision-making process.

    3.    For the reposted Position, Ms. Shani asked me how I felt about reporting to someone "younger" than me and "less experienced" than me, and whether I would be willing to accept the Position with an almost 35% pay reduction. I responded that I had no problem reporting to someone younger or less experienced than me, as this has occurred in my prior employment. I also confirmed that I would accept the position at a lower salary. I emphasized

---

[1] Between graduating, taking the bar exam and getting the license, it takes a minimum of 6 months to become licensed as an attorney in NY.

4

the opportunities that the position presented for me. Our March 7, 2017 discussion was immediately followed by Ms. Shani's invitation to interview for the reposted Position.

4.       With the composition of Ms. Vacarri's team – her direct and indirect reports – being made up of so many individuals who are over 50 years of age (according to the Answer), it is possible that the NYCEDC was concerned that adding "another person over 50" like me would adversely impact its mission and "modern" image. [See 2-E for the image. "The NYCEDC champions a broad range of initiatives designed to *modernize* the City's infrastructure, develop *stronger* neighborhoods, *improve quality of life* in underserved communities and *stimulate* employment *growth* by *encouraging investment* throughout each of New York City's five boroughs" (emphasis added).]

III.     **NYCEDC's claim that the individual selected for the Position was better qualified than Ms. Aschheim**

**NYCEDC Answer (selected points – from Proskauer Letter – Exhibit A):**

3-A     "The individual who was selected for the position, a female candidate in her mid-30's, had five years of prior experience working in a not-for-profit arts department as an outsourced risk manager and three years of prior experience working as a risk analyst.   She also had experience working at a small, start-up brokerage firm, which provided the necessary insurance background."

**Rebuttal:  The individual selected for the Position does not have the qualifications for the position as set forth in the Job Description and the Answer, and was less qualified for the Position than I am.**

1.       According to the Answer, the individual who was selected had five years of experience in a not-for-profit arts department.  The risks associated with the arts are vastly different than the large commercial risks presented by the NYCEDC and its insured constituents as described by NYCEDC.  Moreover, the NYCEDC constituents includes for-profit organizations (as does the NRMC constituent base), such as owners and developers of large commercial, community enhancement projects.

As the NYCEDC states in the Answer (see 1-A above) "The position's primary responsibility was "the development, delivery and oversight of the NYCEDC's insurance and risk management programs by establishing industry best practices in line with regulatory requirements."" (see 1-B above)  The scope of activities engaged in by the NYCEDC and the related risks and applicable insurance coverages are akin to the activities, risks and coverages applicable to the NRMC and FOJP programs.  Those who interviewed me agreed. That is simply not the case with the arts.

Unlike the selected individual's experience, my experiences with NRMC and FOJP were directly relevant to the NYCEDC position.

2.       The individual gained the experience while "outsourced".  By definition "outsourced" means that the individual is not integrated or an integral part of the organization, and is ultimately not responsible to the host organization or its management.  An outsourced position is one that is not allowed or expected to build critical internal relationships since it is intended to provide the organization flexibility to eliminate the engagement without notice.  The

5

NYCEDC notes "The position had a heavy internal customer service component to it" (see 1-C above) and "A successful candidate would be expected to liaison with many different departments in the organization". An outsourced individual does not gain the entrée, experiences or responsibilities that satisfy these qualifications. (see 1-C above).

3.      The position's primary responsibility was "the development, delivery and oversight of the NYCEDC's insurance and risk management programs by establishing industry best practices in line with regulatory requirements." (see 1-A above)  The Answer does not indicate whether the individual selected possessed any of the traits necessary to satisfy these responsibilities or experience that would provide this knowledge.

4.      Based on the full description of the candidate's experience provided in the Answer, the individual did not have any experience leading "a department of one" or any managerial experience, let alone experience as a risk manager (which is not the same as being a risk analyst.)  A risk analyst (which is how the individual is described in the Answer) reports to a risk manager, is supervised by a risk manager and does not have the responsibilities or experience of a risk manager.

5.      The Answer does not mention whether the individual selected complied with the NYC residency requirement for the Position.  I informed NYCEDC that I am a life-long NYC resident and complied with this qualification.

6.      The Answer does not describe any risk management industry credentials so one can presume that the individual selected had none at the time of the hiring decision.  I informed NYCEDC that I was certified and credentialed as a Risk Manager (ARM/ERM/A-ERM) by the leading industry group.

7.      The Answer does not describe what the start-up brokerage firm handles.  Is it the type of risks and markets that are applicable to the NYCEDC and its constituents?  I have already indicated that I reviewed with NYCEDC members during my interviews the specific types of commercial risks and markets I have handled and how they are akin to those of the NYCEDC constituents.

8.      The individual selected lacked the position's publicly disclosed requisite on-point experience that I clearly possessed, but she had something I did not—she is in her mid-30's.

IV.     **NYCEDC's claim that it revamped the positon two to three times in order to elicit more qualified candidates**

**NYCEDC Answer (selected points – from Proskauer Letter – Exhibit A):**

4-A     "The NYCEDC revised the Director job posting on two occasions (3/25/16 and 6/1/16) to try and elicit more qualified candidates, but their efforts were to no avail."

4-B     "After much consideration and internal discussion, NYCEDC decided to revamp the previously posted Director position.  Since the organization was unable to find a candidate that was qualified to take-on what was akin to a chief risk management position, it was decided that the position would be downgraded from a director-level position to a manager-level position. … The new position

6

shared many of the same responsibilities as the prior Director posting, including "manage[ment] of all corporate wide insurance coverage," "manage[ment] [of] internal captive insurance company," "manage[ment] [of] external relationships with third party administrators" and "coordinating all insurance and risk related requests from internal stakeholders," however, it would operate on a lower level."

**Rebuttal: The NYCEDC did not revamp the Position and alter the responsibilities of the Position in a meaningful way or for *bona fide* reasons. It revamped the Position by simply "downgrading" the title and lowering the reporting and compensation while leaving the job requirements intact in order to recruit younger candidates.**

1.        As noted in comparisons of the postings (see **Exhibit D**), and as confirmed by the NYCEDC in the Answer (see 4-B above), the "revamped" Position did not undergo any significant or substantive changes in responsibilities or qualifications from the original posting. (NYCEDC confirms this. See 4-B above: "The new position shared many of the same responsibilities as the prior Director posting…"). The only "responsibilities" that changed were the reporting line and title, leaving the substantive responsibilities intact.   By its own admission, the NYCEDC confirms that the salary for the "revamped" positon was significantly reduced from the initial posting. The effect of such a reduction – almost 35% – is to attract a younger applicant pool on the assumption that younger people are more likely to accept a lower salary.

2.        When Ms. Shani reviewed the "revamped" Position with me during our call on March 7, 2017 and when we met on Monday, March 13, 2017, she acknowledged that the responsibilities would basically remain the same. She noted that the biggest difference was that the compensation for the revamped position would be almost 35 % less than it had been when I first applied. She asked me whether I would be able to accept the Position with a reduced salary and she questioned me about my willingness to report to someone younger and less experienced than me. I assured her these would not be issues for me.

V.        <u>Ms. Vacarri's claim that Ms. Aschheim was not able to answer how she would establish the Director role and department or articulate a reason for leaving NRMC</u>

**NYCEDC Answer (selected points – from Proskauer Letter – Exhibit A):**

5-A     "[W]hen Vaccari [sic] asked Aschheim how she would establish the Director role and build a rapport with the other departments, she could not answer the question."

5-B     "She [Ms. Aschheim] similarly struggled to answer why she was interested in leaving a CEO role with an already-established team to become a department of one."

**Rebuttal: This is not true. This did not happen. The truth is that I provided the Plan (see Exhibit C), a detailed 90-day on-boarding plan for how I would establish the Director role. I also explained to *all* members of the recruiting team – including Ms. Vacarri – that I was looking for other career opportunities because the NRMC program had not renewed at 4/1/16, and was in "run-off" or shutting down. I welcomed the opportunity to become "a department of one" at NYCEDC just like my situation at NRMC for more than 5 years.**

1.        I explained in detail how I would establish the Director role and build a rapport with the other departments. I even provided all members of the recruiting team, including Ms. Vacarri, with the Plan. (Exhibit C.)

7

2.      During my interviews, I made it very clear that I love my work at NRMC and I am thriving there. I showed how NRMC was very successful under my supervision. I also explained that in March 2016, our grant expired and the broker and Board of NRMC announced that our Program had not renewed for PY2016, so NRMC would be placed into "runoff". I explained to all the members of the Recruiting Team that my position at NRMC would be eliminated because NRMC was planning to dissolve.

3.      At no time would I have described my position at NRMC as "a CEO role with an already-established team". NRMC is and always has been an organization *of one*. I am NRMC – the entire staff and the entire organization. I built the network of relationships essential to successfully provide my services. I would do the same for the Position, as we discussed during my interviews.

4.      During my interviews, I stressed the opportunities that I saw in joining NYCEDC and the asset I would be to the organization.

## VI.    NYCEDC's claims that Ms. Vacarri, as the final decision maker for the position, knew that Ms. Aschheim "was not the right fit" and that Ms. Aschheim "did not have the requisite experience for the Position"

**NYCEDC Answer (selected points – from Proskauer Letter – Exhibit E – Selected provisions):**

6.  "On April 20, 2016, Vacarri met with Aschheim …. It was clear to Vacarri that Aschheim, like many others, was not a good fit for the position….. [O]n October 4, 2016, the NYCEDC removed the posting and the Director position remained unfilled…..

In or around February 2017, NYCEDC posted the new position. … Aschheim applied for the position through the NYCEDC's website. Shani contacted Aschheim for an initial screening interview. For the same reasons that Aschheim was considered for the Director position, she was invited for an initial interview for the Insurance & Risk Manager - Accounting position. Aschheim came in to meet with McGlynn [March 13, 2017], who would be the direct supervisor for this lower-level position. McGlynn passed Aschheim through the first round interview and Aschheim was scheduled for a second interview several weeks later. However, when the second round interview candidates were presented to Vaccari [sic], who would be making the final selection decision, she knew from her prior interview with Aschheim [April 20, 2016] that Aschheim did not possess the requisite risk management experience and cancelled the interview."

**Rebuttal: NYCEDC's reliance upon Ms. Vacarri's knowledge that I "did not possess the requisite experience" is contradicted by other statements in the Answer. The Proskauer Letter and Answer contradict Ms. Vacarri's "knowledge" and strongly support the opposite conclusion: that I was a highly qualified candidate for the Position, possessing all of the requisite qualifications posted for the Position.**

1.      I met with Ms. Vacarri only once – on April 20, 2016 – for the first posting of the Position. This was after I successfully completed a first round of interviews. NYCEDC claims that following that 2016 meeting, Ms. Vacarri "knew that Aschheim did not possess the requisite risk management experience", even though my resume and the Plan had already been submitted to her

8

and my interview answers contradicted this.  Apparently no one had the requisite experience and the Position was not filled.  NYCEDC removed the posting on October 4, 2016.

A mere four months later, in February, 2017 the Position was reposted as a "lower level position".  On March 2, 2017. I reapplied for the lower-level Position.  NYCEDC admits that I was invited back to interview for the "lower level" Position because I had the correct qualifications for the revamped position based on my resume, the Plan and my prior interviews.  I was invited to meet again with the Comptroller, Mr. McGlynn, to whom I would now report.  Following my March 2, 2017 meeting with Mr. McGlynn, I was invited to advance further in the interview process.  Both of NYCEDC's 2017 invitations contradict the April 2016 impression of Ms. Vacarri "who would be making the final selection decision, she knew from her prior interview with Aschheim that Aschheim did not possess the requisite risk management experience".  The call back invitations I received in 2017 demonstrate that I had the requisite qualifications for the Position.  But, there was a hidden qualification I lacked:  youth or being no older than in "mid-30's."

2.       The contradiction is obvious.  NYCEDC's claim that I was not qualified for the position and its reliance on Ms. Vacarri's statements begs the question:  **If it was so clear to Ms. Vacarri in 2016 that I "was not the right fit" and that Ms. Vacarri "knew from her prior interview with Aschheim that Aschheim did not possess the requisite risk management experience" then why did NYCEDC keep inviting me to advance through the interview process in 2017 for the reposted Position?**  The answer is obvious:  The NYCEDC illegally factored my age into the NYCEDC's decision-making process.

\*      \*      \*      \*      \*      \*

For the reasons set forth above, the Answer is simply not supported by the facts and does **_not_** support a conclusion that age discrimination was absent from how NYSCED handled my application for the Position.  The work experiences I documented throughout the interview process clearly lay out how my background satisfied the qualifications.  I was successfully advancing through the NYCEDC interview process having met the stated qualifications for the Position when my next interview was abruptly cancelled by NYCEDC so that it could offer the Position to a substantially less qualified "female candidate in her mid-30's".  The Answer provides confirmation that age discrimination featured into the hiring process.  **Therefore, I respectfully request that the Commission complete its investigation into this matter and issue a Determination of Probable Cause, and refer matter to the Office of Administrative Trials and Hearings (OATH) for a trial.**

Thank you for giving this matter your immediate and favorable consideration.  If you require further information from me, please let me know.

Very truly yours,

Deborah S. Aschheim

Attachments

9

*Exhibit A*

*Aschheim Notations for Rebuttal*

# Proskauer»

Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

NEW CO... ...SSION
LAW ENFORCEMENT BUREAU

17  OCT 30  A 11: 26

October 27, 2017

Edna D. Guerrasio
Attorney at Law
d 973.274.3219
f 973.274.3299
eguerrasio@proskauer.com
www.proskauer.com

**By Federal Express**

Carlos Velez
Managing Attorney, Law Enforcement Bureau
New York City Commission on Human Rights
22 Reade Street, 3rd Fl.
New York, New York 10007

RE:   **Deborah Aschheim v. New York City Economic Development Corporation,
Complaint No.: M-E-A-17-24252**

Dear Mr. Velez:

Respondent, the New York City Economic Development Corporation (the "NYCEDC"), submits this position statement in response to the above-referenced Charge of Discrimination filed by Deborah Aschheim.[1]  Contrary to the Charge's allegations, the NYCEDC did not unlawfully discriminate against Ms. Aschheim on the basis of her age.

As discussed in detail below, Aschheim was not hired by the NYCEDC because she did not have the appropriate job experience for the positions she applied to.  Aschheim came to the NYCEDC as an executive, with a legal and insurance background who had worked in an established insurance program development and management role for many years.  The positions at NYCEDC, however, required extensive risk management experience, as well as the skill set to work as a department of one, broker new relationships and and establish a leadership position where none had previously existed.  Aschheim's credentials, while impressive, were simply not the right match.

1-A    1-A

Not only is there ample evidence to support the NYCEDC's legitimate, non-discriminatory reason for not hiring Aschheim, there is absolutely no evidence that Aschheim's age played any role in the NYCEDC's decision-making process.  First, the individual who made the decision to pass upon Aschheim's application had no knowledge of Aschheim's age and was 58 years old herself.  Furthermore, prior to rejecting Aschheim's application, she had been brought back to the NYCEDC for multiple rounds of interviews, for two separate positions.  Aschheim was a heavily considered candidate, just ultimately not the right candidate.  Lastly, Aschheim's Charge is based on nothing more than her own speculation and conclusory statements, neither of which can be used to establish a claim for discrimination.  The NYCEDC submits that the instant

2-A   2-B
2-B

---

[1]  Although believed to be true based on the facts presently known to the NYCEDC, this position statement is being submitted for investigation purposes only and is not to be used as evidence in any judicial or administrative proceeding.  By submitting this position statement, the NYCEDC does not waive its right to present new, different, or additional facts or arguments at any subsequent stage of proceedings, and unless expressly admitted herein, the NYCEDC denies the allegations in the Charge.  The NYCEDC respectfully requests that this position statement be treated as confidential and not disclosed to any third party without advance notice to the NYCEDC.

October 27, 2017
Page 2

Charge of Discrimination has no merit and should be dismissed with a finding of "no probable cause."

## STATEMENT OF RELEVANT FACTS

### I. Background

The NYCEDC is a not-for-profit provider of economic development services for New York City. The NYCEDC champions a broad range of initiatives designed to modernize the City's infrastructure, develop stronger neighborhoods, improve quality of life in underserved communities and stimulate employment growth by encouraging investment throughout each of New York City's five boroughs. The NYCEDC's mission is to "create shared prosperity across New York City's five boroughs by strengthening neighborhoods and growing good jobs."

With these principles as the backdrop for its mission, the NYCEDC is committed to being an equal employment opportunity employer. Its policies prohibit discrimination against applicants and/or employees because of a protected status, including age. *See Exhibit 1.* As stated in the NYCEDC's Equal Employment Opportunity Program and Anti-Harassment Policy:

> NYCEDC's Equal Employment Opportunity (EEO) Policy was created to provide equal opportunity for all employees and applicants for employment by ensuring an environment from off illegal discrimination, including harassment, based on protected categories including race, creed, color, national origin, religion, sex, age, disability, alienage or citizenship status, marital status...

*Id.* This policy is reiterated in its employment postings. There is simply no dispute that the NYCEDC prohibits discrimination in the workplace, including with respect to its applicants, and requires its employees abide by its policies at all times.

### II. The NYCEDC's Employment Application Process

The NYCEDC posts all open positions on its website. Each posting, which identifies the position's responsibilities and requirements, allows interested applicants to submit an online application directly through the NYCEDC's website.

The online application consists of basic identifying information questions, including the applicant's name, address, e-mail address, desired salary, veteran status and a "yes or no" question to confirm that the applicant is age 18 or older. The application does not otherwise ask for the applicant's age or date of birth. The applicant is also asked to submit a resume, cover letter, personal and business references and any other documentation that the applicant would like to have considered with the application.

Once an application is submitted, it is retrieved by the NYCEDC's recruiting team which fields applications and resumes for 30-40 positions at any given time. A member of the NYCEDC's

October 27, 2017
Page 3

recruiting team reviews each application to determine whether the applicant meets the postings minimum requirements.

If a job applicant possesses the necessary qualifications, the applicant is screened through a phone interview with the recruiter. If the applicant passes the initial phone interview, he/she will be invited to the NYCEDC office for an in-person interview with members of the management team for that position. Successful candidates are passed on to a member of the Executive team who makes the final hiring decision.

## III. Aschheim's First Application to the NYCEDC

On or about February 25, 2016, the NYCEDC, through its website, listed a job posting for a newly created position, "Director – Risk Management and Insurance." It was a director-level position, reporting to the Corporate Comptroller. The position's primary responsibility was "the development, delivery and oversight of the NYCEDC's insurance and risk management programs by establishing industry best practices in line with regulatory requirements." As a newly created position within the NYCEDC organization, the position had a heavy internal customer service component to it. A successful candidate would be expected to liaison with different departments in the organization that otherwise would not have interaction with Risk Management and Insurance, in order to establish the Director's responsibility for oversight of the NYCEDC's insurance and risk management program and to address any related issues within those departments. As specifically stated in the posting, the Director would be responsible for "setting the strategic risk management vision and delivering the strategy to the company using exceptional leadership skills, network of internal and external alliances and highly developed business skills."

Aschheim applied to the Director position on March 8, 2016 through the NYCEDC's website. Her application was reviewed by Orit Shani, a member of the NYCEDC's recruiting team, who determined that Aschheim's application met the minimum experience requirements for the position and invited Aschheim to participate in an initial phone interview. Shani had no knowledge of Aschheim's age at the time of the interview.

Aschheim successfully passed the phone interview and was invited for an in-person interview with Fred D'Ascoli, Comptroller, Sr. Vice President in Finance and the direct manager for the position, as well as John McGlynn, Vice President, Revenue, Lease Analysis & Insurance.

On or about March 23, 2016, Aschheim met with D'Ascoli and McGlynn. The interview went well. D'Ascoli and McGlynn were impressed by Aschheim's legal and compliance background and the high-level positions that she had held at her prior employers. D'Ascoli did, however, have some concerns that Aschheim lacked the requisite risk management experience necessary for the position. While Aschheim identified herself as a "risk manager" on her resume, her experience appeared to be more legal and compliance related. D'Ascoli also had concerns as to whether Aschheim's prior work experience was a good fit for the Director position, which was essentially a start-up position that would function within the organization as a department of one – something that stood out as very different from Aschheim's prior experience. Aschheim spoke

October 27, 2017
Page 4

at length about her experience in managing teams within an already-established organizational structure. The Director position, however, was a start-up position and required someone to create and define the position within other departments of the organization.

Despite D'Ascoli's concerns, he and McGlynn determined that Aschheim should meet with NYCEDC's Chief Financial Officer, Kim Vacarri. At the time D'Ascoli and McGlynn invited Aschheim back for a third interview, neither knew her age. D'Ascoli was 64 years old. McGlynn was 55 years old.

On April 20, 2016, Vacarri met with Aschheim. While Vacarri saw some strengths in Aschheim's candidacy, namely her insurance and compliance knowledge and her prior experience in a director-level position, Vacarri had the same concerns as D'Ascoli, including Aschheim's lack of risk management experience and lack of skills to establish the position and broker the necessary relationships. The Director – Risk Management and Insurance position was akin to a chief risk management position, however, Aschheim's experience was more legal and insurance based. In addition, Aschheim did not have any experience in establishing a position from scratch and building a department. Rather, her experience was in stepping into an already-established executive functions. In fact, when Vaccari asked Aschheim how she would establish the Director role and build a rapport with the other departments, she could not answer the question. She similarly struggled to answer why she was interested in leaving a CEO role with an already-established team to become a department of one. It was clear to Vacarri that Aschheim, like many others, was not a good fit for the position. Vaccari, who is 58 years old, had no knowledge of Aschheim's age at the time of her interview.

NYCEDC searched for a candidate for the Director – Risk Management and Insurance position for more than six months. The organization received 256 applications for the position, only 23 of which passed the initial screening and were invited for an in-person interview. Of those 23, nine individuals were called back for a second in-person interview, one of whom was Aschheim. Over the course of the six-month job-posting, the NYCEDC saw many candidates with insurance and compliance backgrounds and high-level executive experience, much like Aschheim. However, they did not find a candidate that was qualified to fill their specific need for a candidate with insurance and risk management knowledge, who also had experience in building a department from the ground up. The NYCEDC revised the Director job posting on two occasions (3/25/16 and 6/1/16) to try and elicit more qualified candidates, but their efforts were to no avail. In fact, the organization started seeing repeat applications from candidates who had previously been rejected, including Aschheim. Accordingly, on October 4 2016, the NYCEDC removed the posting and the Director position remained unfilled.

## IV. Aschheim's Second Application to NYCEDC

After much consideration and internal discussion, NYCEDC decided to revamp the previously posted Director position. Since the organization was unable to find a candidate that was qualified to take-on what was akin to a chief risk management position, it was decided that the position would be downgraded from a director-level position to a manager-level position. The new position, which was titled "Insurance & Risk Manager – Accounting" would report to the

October 27, 2017
Page 5

4-B

Vice President, Revenue, Lease Analysis & Insurance in the Accounting Department, as opposed to the Comptroller. The new position shared many of the same responsibilities as the prior Director posting, including "manage[ment] of all corporate wide insurance coverage," "manage[ment] [of] internal captive insurance company," "manage[ment] [of] external relationships with third party administrators" and "coordinating all insurance and risk related requests from internal stakeholders," however, it would operate on a lower level.

4-B

In or around February 2017, NYCEDC posted the new position, Insurance & Risk Manager – Accounting, on its website. Aschheim applied for the position through the NYCEDC's website. Shani contacted Aschheim for an initial screening interview. For the same reasons that Aschheim was considered for the Director position, she was invited for an initial interview for the Insurance & Risk Manager – Accounting position. Aschheim came in to meet with McGlynn, who would be the direct supervisor for this lower-level position. McGlynn passed Aschheim through the first round interview and Aschheim was scheduled for a second interview several weeks later. However, when the second round interview candidates were presented to Vaccari, who would be making the final selection decision, she knew from her prior interview with Aschheim that Aschheim did not possess the requisite risk management experience and cancelled the interview.

## V.  The NYCEDC'S Selection of a Candidate with the Relevant Employment Experience

3-A

The Insurance & Risk Manager – Accounting position was ultimately filled on May 22, 2017. The posting received 98 applications and nine individuals were brought-in for an in-person interview, including Aschheim. The individual who was selected for the position, a female candidate in her mid-30's, had five years of prior experience working in a not-for-profit arts department as an outsourced risk manager and three years of prior experience working as a risk analyst. She also had experience working at a small, start-up brokerage firm, which provided the necessary insurance background.

3-A

## THE CHARGE FAILS TO STATE A VIABLE CLAIM OF DISCRIMINATION AS A MATTER OF LAW

### I.    Aschheim Has Failed to Establish A *Prima Facie* Case of Discrimination.

Discrimination claims brought under the ADEA are analyzed under the burden-shifting framework originally set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). See also, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 168–69 (2000); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981). Under this framework, Aschheim has the initial burden of showing that: (i) she was a member of a protected class; (ii) she was qualified for the position; (iii) she suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. Discrimination claims brought under the New York City Human Rights Law are analyzed under the "mixed-motive" framework. Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 127 (1st Dep't 2012). Under the "mixed-motive" analysis, "the employer's production of evidence of a legitimate reason for the

October 27, 2017
Page 6

challenged action shifts to the plaintiff the lesser burden of raising an issue as to whether the action was 'motivated at least in part by . . . discrimination.'" *Id.* at 127 (internal citations omitted). "[T]he burden of persuasion of the ultimate issue of discrimination always remains with the plaintiff." *Id.* at 114.

Aschheim cannot establish that she was qualified for the position, nor that the circumstances under which she was not selected give rise to an inference of discrimination or that Respondent was motivated "at least in part" by discrimination. Several key facts establish that the NYCEDC did not discriminate against Aschheim. First, Aschheim did not have the requisite risk management work experience for the posted positions. Furthermore, when asked, Aschheim could not articulate how she would establish the Director role and build relationships with the other departments, which was expected of a qualified candidate.

Even if Aschheim was able to show that she was qualified for the position – which she cannot – the one alleged statement that she offers in support of her claims is insufficient to establish an inference of discrimination as a matter of law. In her Charge, Aschheim alleges that during the April 20, 2016 interview for the Director position, "she was asked how she would feel about reporting to someone with less experience than she had or who was younger than her." As an initial matter, NYCEDC denies that such a comment was ever made. In fact, the comment is nonsensical in the context in which Aschheim alleges it occurred. Aschheim states that the comment was made during her interview for the Director position. However, the individual who was the Comptroller at the time, (and the individual who Aschheim would report to) is 64 years old, two years older than Aschheim.

Given that the only basis upon which Aschheim tries to establish her claim is the this comment, her allegations are woefully insufficient. The indisputable evidence demonstrates that Vacarri denied Aschheim's application because she did not possess the requisite experience. Without evidence that Vacarri or anyone at the NYCEDC considered Aschheim's age as a factor in the selection process, Aschheim's speculation and conclusory statement simply cannot establish a claim for discrimination. *See* Adams v. Debevoise & Plimpton, 2004 WL 1737826, at *6 (S.D.N.Y. Aug. 3, 2004) (rejecting discrimination claim where plaintiff "introduce[d] no additional evidence, beyond his own unfounded, speculative, and conclusory allegations").

Relatedly, when the supervisor making the employment decision is in the same protected class as the complainant, there is a strong inference against finding any discriminatory intent on the part of that decision-maker. *See* Connell v. Consol. Edison Co. of New York, 109 F. Supp. 2d 202, 209 (S.D.N.Y. 2000) (granting summary judgment on employee's ADEA claim, in part, because all of the people involved in the decision to terminate plaintiff's performance were in the same protected age class as the plaintiff); Hanna v. New York Hotel Trades Council, 18 Misc. 3d 436, 440, 851 N.Y.S.2d 818, 823 (Sup. Ct. N.Y. Cty 2007) (summary judgment granted on discrimination and retaliation claims, in part, because the decision-maker was a member of the same protected class as the plaintiff). All of the individuals who interviewed Aschheim and contributed to the hiring decision are over age 50, including D'Ascoli (64 yrs), McGlynn (55 yrs) and Vacarri (58 yrs). In fact, Vacarri, the individual who made the decision to pass upon

October 27, 2017
Page 7

Aschheim's application is 58 years old, is not only in the same protected class as Aschheim but is virtually the same age.

## II.     Aschheim's Allegations Are Insufficient to Rebut Legitimate, Non-Discriminatory Reason for Non-Selection

Even if Aschheim could establish a *prima facie* case of discrimination, which she cannot, her claims would ultimately fail because she can present no evidence to rebut the legitimate, non-discriminatory business reason that the NYCEDC has articulated for rejecting her application.[2]

As discussed above, there is simply no evidence that the NYCEDC's legitimate business reason for not selecting Aschheim for the open Director and Manager positions, namely lack of risk management experience and the preference for a very highly qualified candidate, is a pretext for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–10 (1993). Aschheim's Charge amounts to nothing more than a request that the Commission second-guess the NYCEDC's justifiable business decision. But the role of administrative agencies enforcing anti-discrimination laws "is to prevent unlawful [employment] practices, not to act as a super personnel department that second guesses employers' business judgments." Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2001) (quoting Byrnie v. Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001)).

## CONCLUSION

For all the reasons stated above, the NYCEDC respectfully requests that the Division dismiss the Charge of Discrimination in its entirety.

Respectfully submitted,

Edna D. Guerrasio

---

[2] Under the McDonnell Douglas Corp. v. Green framework, if the plaintiff establishes a *prima facie* case, the defendant must articulate – but need not prove – a legitimate, non-discriminatory reason for the decision. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (explaining that defendant's burden is one of production, not persuasion). Once the defendant produces a legitimate reason for its decision, the plaintiff must advance sufficient evidence on which a reasonable jury could conclude that the stated reason is false or a pretext for discrimination and that it is more likely than not that plaintiff was denied the sought-after position because of race discrimination. See St. Mary's Honor Ctr., 509 U.S. at 515; James v. N.Y. Racing Ass'n, 233 F.3d 149, 154, 157 (2d Cir. 2000).

# DEBORAH S. ASCHHEIM

**EXHIBIT B-1**

383 West End Ave. / New York, NY 10024 / 917.882.9949 / debaschheim@aol.com **(2016 Resume)**

**Accomplished attorney (JD/MBA) and risk manager (ARM) with expertise in compliance, loss mitigation, insurance coverage and placement, corporate transactions, finance, best practices and enterprise risk management (ERM), who partners with business teams to address and mitigate risk, realize significant savings and achieve strategic goals.**

## NEIGHBORHOOD RISK MANAGEMENT CORP. *Executive Director/CLO*   Feb. 2012 to Present

NRMC is a not-for-profit providing risk management and loss mitigation programs to more than 45 organizations that provide affordable housing throughout the US (TIV = $3.1B, 25,000 residential units). NRMC provides complete risk services, including coverage, placement, compliance, best practices, benchmarking and training.

- Insurance program development and management, including placement, coverage reviews, analytics, finance, underwriting, claims handling, subrogation and recoveries, regulatory compliance.
- Litigation and Claims Management, including development and implementation of tailored risk reduction programs, best practices and training, contractual risk transfer, CyberRisk, fire safety, property management and emergency preparedness and related compliance and benchmarking.
- Negotiate, draft and implement commercial contracts, ranging from M&A, IT/IP, vendor management, outsourcing, construction and consultant relationships. Develop and Conduct Training.
- Liaison to stakeholders (Board, insureds, vendors, claimants, TPAs, auditors, press and the public).

## HUDSON INSURANCE GROUP   *Vice President & Deputy General Counsel/CLO*      2010 – 2011

Develop and implement group P&C insurance programs (P&C, professional liability, environmental, WC and GL); claims handling, reserving, captive management, compliance, administration.

- Managed insurance product and policy development for property, environmental, employment, GL and WC coverages; managed national claims handling by TPAs; regulatory compliance.
- Developed risk reduction programs and underwriting benchmarks.
- Managed Legal Department staff of 6, and achieved $375,000 in Hudson's direct savings.
- Negotiated, structured and drafted commercial contracts and conducted due diligence for business development, M&A, procurement, RFPs, TPA/vendor, MGAs, outsourcing and finance.
- Managed IP/IT portfolio and implemented e-Commerce and CyberSecurity initiatives.

## In-House Legal Consulting Engagements                              2008 – 2012

- **HSBC BANK**: *Troubled Credits Commercial Loan Workout Special Counsel.*
- **CHEMTURA CHEMICALS**: *Special Ch. 11 Counsel.* Counseled on liability issues in Ch. 11 case.

## FOJP SERVICE CORP. (not-for-profit) *Deputy General Counsel*              2004 – 2008

Counseled, represented and developed strategic risk management initiatives for UJA-Federation captive insurance program for NYC hospitals and social benefit agencies, with extensive training, negotiating, structuring and drafting duties. Addressed M&A and all risk management issues for our members. Counseled FOJP and members on M&A and technology matters, M&A, data security, and general corporate matters.

## TRENWICK GROUP   *Vice President & Associate General Counsel*            2003 – 2004

Represented Trenwick in the run-off of its global P&C insurance operations, Chapter 11 Case and liquidation. Trenwick specialized in liability coverages. Handled all general commercial and technology matters including M&A, HR and outsourcing, leases and licensing, IT/IP, procurement and collections. Corporate Secretary.

**AMERICAN INTERNATIONAL GROUP** and **ACE LIMITED**                    1997 – 2003
 *Counsel for business team that moved from AIG Risk Finance to Ace Financial Solutions*

Legal Partner to Business Teams.  Developed global strategic initiatives in partnership with business development teams that offer insurance and reinsurance solutions that combine tradition insurance products with capital market strategies, with emphasis on real estate and hospitality industries.

**CHASE MANHATTAN BANK**  *Vice President and Senior Associate Counsel*      1986 – 1996
 *Invited to come in-house with Milbank, Tweed's then largest client, Chase Bank*

Provided complete legal support for Chase businesses in all aspects of domestic and international finance (public and private), debt restructurings and workouts, DIP financings, secured lending and bankruptcies, with emphasis on real estate and hospitality industries.

**MILBANK, TWEED, HADLEY & McCLOY**  *Associate – Banking/Bankruptcy*       1983 – 1986

**STROOCK & STROOCK & LAVAN**  *Associate – Corporate Dept.*               1981 – 1983


## EDUCATION & CERTIFICATIONS

**BENJAMIN N. CARDOZO SCHOOL OF LAW**                                   1981
 *JD / Juris Doctor*

**COLUMBIA UNIVERSITY SCHOOL OF LAW and
COLUMBIA UNIVERSITY GRADUATE SCHOOL OF BUSINESS**                       1981
 *MBA / Masters of Business Administration (Finance)*
 (Joint JD/MBA program in conjunction with Benjamin N. Cardozo School of Law)

**BARNARD COLLEGE**                                                     1977
 *Bachelor of Arts, cum laude,* History

**CERTIFICATION:**  Associate in Risk Management (ARM)                  2015


**BAR ADMISSION**: New York          **1982**

# DEBORAH S. ASCHHEIM

**EXHIBIT B-2**
**2017 Resume**

383 West End Ave. / New York, NY 10024 / 917.882.9949 / debaschheim@gmail.com

**Accomplished risk manager/insurance professional (ARM/ERM/A-ERM) and attorney (JD/MBA) with expertise in insurance placements (policies, underwriting and structure), compliance, loss mitigation and tailored loss mitigation programs for small businesses, who partners with pacesetting business teams to address and mitigate risk and achieve strategic goals.**

**NEIGHBORHOOD RISK MANAGEMENT CORP.** *Executive Director/CRO*        Feb. 2012 - Present

NRMC is a not-for-profit that manages insurance and loss mitigation programs to 45+ organizations that provide affordable housing throughout the US (TIV = $3.1B, 25,000 residential units). NRMC provides complete captive insurance/risk services, including coverage, placement, compliance, best practices, benchmarking and training.

- Insurance program development and management, including negotiating and structuring policy terms and language; underwriting and placement; claims adjusting & reviews, analytics; finance; subrogation, recoveries, regulatory compliance and benchmarking. Develop and conduct tailored RM training.
- Litigation and Claims Management, including reserving, development and implementation of tailored risk reduction programs, best practices and training, contractual risk transfer, CyberRisk, project management, property management, emergency preparedness, compliance and benchmarking.
- Manage captive insurance regulatory compliance and reporting, member issues.
- Negotiate, draft, manage and implement contracts for TPAs, MGAs, reinsurance, M&A, IT/IP, vendor management, outsourcing, construction and consultant relationships. Develop and Conduct Training.
- Liaison to stakeholders (TPAs, insurance carriers, Boards, insureds, vendors, claimants and auditors).

**Law offices of Patterson & Aschheim / In-House Legal Consulting Engagements**        2008 – Present

- **HSBC BANK**: *Troubled Credits & Commercial Loan Workout Special Counsel & Documentation Specialist.*
- **CHEMTURA CHEMICALS**: *Special Ch. 11 Counsel.* Counseled on insurance issues in Ch. 11 case.
- **Volunteer - NYC Business Solutions**: Counsel on insurance and legal issues for small businesses.

**HUDSON INSURANCE GROUP** *Vice President & Deputy General Counsel/CLO*        2010 – 2011

Developed and implemented group P&C insurance programs (P&C, professional liability, environmental, WC and GL); claims handling, reserving, captive management, compliance, administration.

- Managed insurance product and policy development and language for property, environmental, employment, GL and WC coverages; managed national claims handling and reserving by TPAs.
- Compliance and developed tailored risk reduction programs and underwriting benchmarks.

**FOJP SERVICE CORP.** (not-for-profit) *Deputy General Counsel*        2004 – 2008

Addressed all captive insurance, risk management and strategic initiatives for NYC hospitals and social benefit agencies, with extensive underwriting, policy, training, negotiating, structuring and drafting duties. Counseled FOJP and members on M&A and technology matters, CyberRisk and HIPAA, M&A, data security and general corporate matters.

**TRENWICK GROUP** *Vice President & Associate General Counsel*        2003 – 2004

Represented Trenwick in the run-off of its global P&C insurance operations, Chapter 11 Case and liquidation. Trenwick specialized in liability coverages. Handled all general commercial and technology matters including M&A, HR and outsourcing, leases and licensing, IT/IP, procurement and collections. Corporate Secretary.

**AMERICAN INTERNATIONAL GROUP** and **ACE LIMITED**                           1997 – 2003
*Counsel for business team that moved from AIG Risk Finance to Ace Financial Solutions*

Legal Partner to Business Teams.  Developed global strategic initiatives in partnership with business development teams that offer insurance and reinsurance solutions that combine tradition insurance products with capital market strategies, with emphasis on real estate and hospitality industries.

## EDUCATION & CERTIFICATIONS

**BENJAMIN N. CARDOZO SCHOOL OF LAW**
*JD / Juris Doctor*

**COLUMBIA UNIVERSITY SCHOOL OF LAW and**
**COLUMBIA UNIVERSITY GRADUATE SCHOOL OF BUSINESS**
*MBA / Masters of Business Administration (Finance)*
(Joint JD/MBA program in conjunction with Benjamin N. Cardozo School of Law)

**BARNARD COLLEGE**
*Bachelor of Arts, cum laude*, History

**CERTIFICATIONS:**  Associate in Risk Management (ARM)
        Enterprise-Wide Risk Management (ERM)
        Associate in Risk Management – Enterprise Risk Management (A-ERM)

**WORKSHOPS & TRAINING**:
- Designed and conducted more than 25 tailored training workshops and certification programs (on-line and live) on contractual risk transfer, insurance and certificates, indemnities, subrogation and recoveries, M&A and other transactions impacting business goals.
- Designed and conducted more than 10 training workshops on real estate, technology contracts and related matters, including M&A, RFPs, outsourcing, clouds, SaaS, cyberrisk protections, ransomware, privacy, compliance and data recovery planning.
- Developed an emergency preparedness / resiliency app for businesses and residents.

**BAR ADMISSION**: New York

**RESIDENCY**: New York City (Manhattan) – for more than 10 years

EXHIBIT 4



Deborah S. Aschheim

917.882.9949    debaschheim@aol.com

TO:            Frank D'Ascoli

CC:            John McGlynn
               Orit Shani

FROM:          Deborah S. Aschheim, Candidate

RE:            Model for On-Boarding as Director of Risk Management - NYCEDC

DATE:          April 4, 2016

Since our meeting, I have considered how I would transition and develop as Director of Risk Management – NYCEDC, a newly created position.  This is my **DRAFT** outline in support of my candidacy and for on-boarding plan for your feedback.

### Phases of Transition / On-Boarding

I suggest a 90 day transition period with 3 major phases.  Matters requiring immediate attention, would receive priority attention.

| 1 | 2 | | 3 |
|---|---|---|---|
| **Absorption / Immediate Priorities** | **Synthesis & Development** | **Planning** | **Solidify & Implement** |
| Starts Day 1; Est. 30 days | Starts Day 31; Est. 45 days | Starts Day 30; Est. 60 days; solidify by Day 90. | Starts Day 90 |

### Elements of Transition / On-Boarding

**Phase 1:        Absorption / Identify immediate priorities**

1.  Meet with Frank and other key stakeholders to identify and establish priorities and goals.

   ➢ Internal:  key department leaders (ex.  Finance, Legal / Compliance, IT, HR)
   ➢ External:   with insurance broker(s), TPA(s), actuaries and other key service providers, consultants
   ➢ Captive manager (and consultant, actuaries)

1



Deborah S. Aschheim

917.882.9949    debaschheim@aol.com

2. Review / Agenda might include (I would begin to review prior to "official start" at NYCEDC):

➢ Learn the NYCEDC organization: history or structure, projects (current and past 5 years) and entities; project management protocols, systems and delivery of key services; compliance, data management and policies & procedures.
➢ Key agreements for services by broker, TPA(s), actuaries and consultants; vendors
➢ Update on captive formation, program structure and management
➢ Renewal calendar and marketing plans / placement / structure
➢ Policies (last 5 years) / renewal calendar / Property listings and SOVs, submissions / costs
➢ Loss Runs and coverage bordereaux (last 5 years) and other TPA / Claims counsel reports
➢ Financial Reports & Annual Reports (including budgets) / Audits / other internal and external reports to NYCEDC Management
➢ Board minutes and packets (last 5 years; eventually more)
➢ Actuarial studies, including captive feasibility plan and filings, MPL studies
➢ Examinations, reviews and audits (internal and external)
➢ NYCEDC Policies & Procedures and data management systems and forms relating to insurance and incidents; related P&P for projects and events
➢ Certificates / Vendor compliance (key contracts and certificate) management systems / Compliance Manager
➢ Applicable compliance systems and reports / review regulatory filings
➢ Emergency Preparedness plans for NYCEDC and participants in NYCEDC projects
➢ CyberSecurity measures / IT back-up plans / IT vendor vetting
➢ Employee / HR policies, union contracts, training resources, volunteer policies
➢ Major Contracts and Projects [set $ threshold], including provider agreements, admission agreements, financing agreements, and other key contracts; 10 major vendor contracts
➢ Become familiar with current strategic plans and projects impacting NYCEDC Risk Management – what's in the pipeline

**Phase 2:        Synthesis and Development / Planning**

1. Review and synthesize all materials from meetings and reviews
2. Determine SWOT, needs, resources, budgets, and which assets to leverage
3. Determine goals and priorities (immediate / short term / long term)
4. Develop / draft plan and goals for the position and the management of the RM function, including database(s), dashboards and benchmarking tools; understand current systems and reporting, the priorities, budgets, timelines, etc.
5. Meet with Frank to review, confirm and finalize goals, priorities and plans, presentation
6. Meet with key stakeholder to present the plan, expectations, goals, budgets, timelines and execution plan; consider training and information distribution

2



Deborah S. Aschheim

917.882.9949    debaschheim@aol.com

**Phase 3:**      **Solidify and Implement**

1. Finalize RM Team Plan and present to / finalize with Frank and other key stakeholders
2. Develop RM systems and work with broker, actuaries and other stakeholders to implement
3. Benchmark every quarter
4. Evaluations of key stakeholders as needed
5. Plan for appropriate apps

### Conclusion

This DRAFT is merely suggestive. I hope it will form the basis of a dialogue to establish a long and mutually rewarding relationship. I welcome the opportunity to review this with you and the other relevant members of the NYCEDC Team as soon as possible as I continue to be interested in this opportunity.

Respectfully submitted,

Deborah S. Aschheim

3

CONFIDENTIAL DISCUSSION DRAFT:    April 4, 2016

[ *Comparison*
*see pages 3+4* ]

*Exhibit 12*

**NYC Economic Development Corp.    Director, Risk Management and Insurance**

**Accounting/ Finance | New York, NY**

| Feb. 27, 2016 |

*Due to cosmetic changes, an electronic comparison is meaningless*

**Position Overview:**

New York City Economic Development Corporation is seeking a senior level Risk Manager. Reporting into the Corporate Comptroller/SVP in Finance, the Director of Risk Management and Insurance is responsible for the development, delivery and oversight of the corporation's insurance and risk management programs by establishing industry best practices in line with regulatory requirements.

**Responsibilities:**

- Setting the strategic risk management vision and delivering that strategy to the company using exceptional leadership skills, network of internal and external alliances and highly developed business skills.

- Oversee or monitor all operational risk management activities of the organization and manage all corporate wide insurance coverage. (this is separate from the internal audit functions)

- Identify, evaluate, mitigate, and monitor the company's operational and strategic property and liability risk. This will include responsibility for all commercial insurance policies, day to day liaison with the corporation's insurance brokers, advisors and third party administrators (TPAs).

- Responsible for coordinating all internal departments that currently play a role in the various insurance functions at NYCEDC including Asset Management, Legal, Compliance and Finance.

- Ensures the organization's risk management policies and strategies are in compliance with applicable regulations, contracts, state and city laws and strategic imperatives of the organization.

- Monitors and analyzes risks within the company's business units and reports on these risks to the Executive Vice President of Finance and the CFO.

- Identifying, measuring and managing insurable or hazard risks, developing reports and plans, and analyzing risk/insurance problems and defining and/or overseeing the implementation of the risk solutions that help optimize operations.

- Accountable for ensuring effective hazard risk management (typically insurable risks) for the organization and leading key stakeholders.

- Manager of internal captive insurance company including the development of programs and policies to be used with the captive and the day-to-day liaison with the captive manager.

- Work closely with the Legal Department on all claims and claims management function.

- Oversee the development of alternative insurance programs – surety programs, OCIPs, CCIPS and directing the purchase of insurance programs, management of claims and loss control activities, management of relationships with third party service providers including brokers, insurers and other TPAs, preparing loss analyses and budgets, identifying exposures,

1

recommending solutions, implementing approved programs, promoting loss prevention, updating and monitoring compliance with insurance procedures and managing safety/risk management manuals.

**Requirements:**

 • 7+ years relevant commercial insurance and/or risk management experience.

 • Experience as a corporate risk manager directly involved in the purchase of coverages is strongly preferred

 • Extensive knowledge of and experience in the commercial insurance markets

 • Knowledge of risk management governance and controls

 • Recognized risk leader, who is a dynamic, proactive and decisive

 • Adapts well to and initiates change in the organization. Seeks ways to optimize risks in the organization as a competitive business advantage

 • Demonstrated relationship-building skills, with a superior ability to make things happen through the use of positive influence.

 • Excellent people management and leadership abilities

• Superior communication, facilitation and consensus-building skills

 • Conceptual and practical thinking and implementation skills

 • Process design and analysis skills

 • Strong research, analysis and judgment skills

 • Strong PowerPoint skills, intermediate Excel skills

 • ARM, CPCU certification preferable

**About the Accounting Department**

Accounting is the largest of the three departments that make up the Finance Division, along with Budget and Grants Management. The Accounting Department manages the collection, transfer, investment, and disbursement of funds for NYCEDC and its related entities. It records financial transactions in various systems and then compiles and presents financial statements to Management, the Board of Directors, and other stakeholders in New York City and New York State.

**About NYCEDC**

New York City Economic Development Corporation is the City's primary vehicle for promoting economic growth in each of the five boroughs. NYCEDC's mission is to stimulate job growth through expansion and redevelopment programs that encourage investment, generate prosperity and strengthen the City's competitive position. NYCEDC serves as an advocate to the business community by building relationships with companies that allow them to take advantage of New York City's many opportunities. Additional information on NYCEDC can be found by visiting http://www.nycedc.com/.

Our **Diversity & Inclusion** Mission is to attract, retain, and engage a diverse workforce comprised of talented people. Like the city of New York, NYCEDC knows our strength comes from each of our connected parts, making the fabric of our organization better and stronger because of our unique employees' talents. NYCEDC employees can expect to work as part of a highly engaged, passionate and inclusive workforce where everyone's contributions are valued, respected and make an impact on one of the best and most diverse cities in the world!

2

*Comparison of Feb. 2016 NYCEDC Description to Feb. 2017 NYCEDC Description*

NYC Economic Development Corporation

POSTING | Risk Insurance Manager | Feb 27, 2017    MARCH 2017

Job description    *Was Director, Risk Management & Insurance. 3/27/16*
*was Director of Insurance - 6/15/16.*

**Our Vision:** To make New York City the global model for inclusive innovation and economic growth, fueled by the City's diverse people and businesses.

**Our Mission:** To create shared prosperity across New York City's five boroughs by strengthening neighborhoods and growing good jobs.

**The Accounting Department** is the largest of the three departments that make up the Finance Division, along with Budget and Grants Management. We manage the collection, transfer, investment, and disbursement of funds for NYCEDC and its related entities. We record all financial transactions in various systems and comply with statutory and accounting regulations and pronouncements and present financial statements to Management, the Board of Directors, and other stakeholders in New York City and New York State. We also prepare the Corporation's payroll and process all payments from NYCEDC and its entities. *[development removed]*

*Senior removed*

**Your Role:** As a member of our Accounting team, you will be responsible for the delivery and oversight of the corporation's insurance and risk management programs. You will interact regularly with other departments and staff throughout the Corporation in order to establish industry best practices.

*numbers show relationship/inclusion in 2016 JobDescription*

**Responsibilities:**

*1,2,3* • Manage all corporate wide insurance coverage

*9* • Manage internal captive insurance company including the development of processes and policies to be used with the captive

*10* • Establish firm-wide claim management process, working closely with the Legal Department on all claims

*4,5,6,7,8* • Responsible for coordinating all insurance and risk related requests from internal stakeholders that currently play a role in the various insurance functions at NYCEDC

*3,5,11* • Manage external relationships with third party administrators (TPAs), corporation's insurance brokers, insurers, the captive insurance company manager and City, State and Federal agencies *Added - But this is part of 5,8,10*

*Added ?* • Coordinate FEMA reimbursements with insurance proceeds received and other Federal agency requests

**Qualifications:** *was 7yrs*

*1* • Bachelor's or equivalent degree required; ARM, CPCU certification preferable.

*1* • (5+ years') relevant commercial insurance and/or risk management experience

*2,3,4,5* • Knowledge and experience as a corporate risk manager directly involved in the purchase of coverages in the commercial insurance markets

*4* • Knowledge of risk management governance and controls

*13* • Strong PowerPoint skills, intermediate Excel skills

*6* • Adapts well to and initiates change in the organization.

*7,9* • Superior communication, facilitation and consensus building skills

*11* • Process design and analysis skills

*8,9,12* • Must be team oriented and perform all duties in a professional and conscientious manner.

• Must have the ethical and confidential requirements commensurate to the profession.

*Added. Yet 2016 Requirements infer this*

*3*

- Must be a New York City resident within 180 days of hire. ⟋ This was in the 2016 description (revised by NYCEDC

see Exhibit

4

# Proskauer:»  Proskauer Rose LLP    Eleven Times Square    New York NY 10036-8299

Edna D. Guerrasio
Attorney at Law
d 973.274.3219
f 973.274.3299
eg uerrasio@proskauer.com
www.proskauer.com

October 27, 2017

## By Federal Express

Carlos Velez
Managing Attorney, Law Enforcement Bureau
New York City Commission on Human Rights
22 Reade Street, 3rd Fl.
New York, New York 10007

October 27, 2017
Page 4

On April 20, 2016, Vacarri met with Aschheim. While Vacarri saw some strengths in Aschheim's candidacy, namely her insurance and compliance knowledge and her prior experience in a director-level position, Vacarri had the same concerns as D' Ascoli, including Aschheim's lack of risk management experience and lack of skills to establish the position and broker the necessary relationships. The Director- Risk Management and Insurance position was akin to a chief risk management position, however, Aschheim's experience was more legal and insurance based. In addition, Aschheim did not have any experience in establishing a position from scratch and building a department. Rather, her experience was in stepping into an already-established executive functions. In fact, when Vaccari asked Aschheim how she would establish the Director role and build a rapport with the other departments, she could not answer the question. She similarly struggled to answer why she was interested in leaving a CEO role with an already-established team to become a department of one. It was clear to Vacarri that Aschheim, like many others, was not a good fit for the position. Vaccari, who is 58 years old, had no knowledge of Aschheim's age at the time of her interview.

NYCEDC searched for a candidate for the Director - Risk Management and Insurance position for more than six months. The organization rec ived 256 applications for the position, only 23 of which passed the initial screening and were invited for an in-person interview. Of those 23, nine individuals were called back for a second in-person interview, one of whom was Aschheim. Over the course of the six-month job-posting, the NYCEDC saw many candidates with insurance and compliance backgrounds and high-level executive experience, much like Aschheim. However, they did not find a candidate that was qualified to fill their specific need for a candidate with insurance and risk management knowledge, who also had experience in building a department from the ground up. The NYCEDC revised the Director job posting on two occasions (3/25/16 and 6/1/16) to try and elicit more qualified candidates, but their efforts were to no avail. In fact, the organization started seeing repeat applications from candidates who had previously been rejected, including Aschheim. Accordingly, on October 4 2016, the NYCEDC removed the posting and the Director position remained unfilled.

## I.    Aschheim's Second Application to NYCEDC

After much consideration and internal discussion, NYCEDC decided to revamp the previously posted Director position. Since the organization was unable to find a candidate that was qualified to take-on what was akin to a chief risk management position, it was decided that the position would be downgraded from a director-level position to a manager-level position. The new position, which was titled "Insurance & Risk Manager - Accounting" would report to the

October 27, 2017
Page 5

Vice President, Revenue, Lease Analysis & Insurance in the Accounting Department, as opposed to the Comptroller. The new position shared many of the same responsibilities as the prior Director posting, including "manage[ment] of all corporate wide insurance coverage," "manage[ment] [of] internal captive insurance company," "manage[ment] [of] external relationships with third party administrators" and "coordinating all insurance and risk related requests from internal stakeholders," however, it would operate on a lower level.

In or around February 2017, NYCEDC posted the new position, Insurance & Risk Manager - Accounting, on its website. Aschheim applied for the position through the NYCEDC's website. Shani contacted Aschheim for an initial screening interview.  For the same reasons that Aschheim was considered for the Director position, she was invited for an initial interview for  the Insurance & Risk Manager - Accounting position. Aschheim came in to meet with McGlynn, who would be the direct supervisor for this lower-level position. McGlynn passed Aschheim through the first round interview and Aschheim was scheduled for a second interview several weeks later. However, when the second round interview candidates were presented to Vaccari, who would be making the final selection decision, she knew from her prior interview with Aschheim that Aschheim did not possess the requisite risk management experience and cancelled the interview.

Exhibit D

Aschheim Vs. New York City Economic Development Corporation (NYCEDC)

III.E   Supplement Materials

Exhibit D – NYCCHR Dismissal for Administrative Purposes (January 24, 2017) to Plaintiff



Conor Ahern
Staff Attorney
*Law Enforcement Bureau*
cdahern@cchr.nyc.gov
212-416-0219 (phone)
646-500-7025 (fax)

January 24, 2018

**VIA U.S. MAIL**

Deborah Aschheim, Esq.
383 West End Avenue
New York, NY 10024

   Re: *Deborah Aschheim v. New York City Economic Development Corporation*
      Complaint No.: M-E-A-17-24252; Fed. Charge No.: 16F-2017-00353C

Dear Ms. Aschheim:

   The complaint of discrimination you filed with the New York City Commission on Human Rights ("Commission") has been dismissed for administrative convenience. This means the Law Enforcement Bureau has decided not to further investigate your complaint because it will not serve the public interest.

   RIGHT TO FILE IN COURT: This determination preserves your right to file a civil action pursuant to Section 8-502 of the Administrative Code of the City of New York. This means you can now file the same claim in court or in another forum. You must file your claim within three (3) years after the discriminatory practice occurred, however, while your claim was pending at the Commission that time period was tolled, which means that time period does not count towards the calculation of the three (3) year deadline.

   RIGHT TO APPEAL: If you do not agree with the decision to dismiss this complaint, you may ask the Office of the Chairperson to review it by writing a letter to the Office of General Counsel, New York City Commission on Human Rights, 22 Reade Street, New York, NY 10007. Your letter should explain the reasons you disagree with the decision. You must send your letter within thirty (30) days from the date you receive this notice. You must also send a copy to the Respondents.

   If you have any questions about this process, you may call the Office of the Chair at (212) 416-0128. Please note, however, that appeal requests will not be accepted by telephone and must be submitted in writing to the address indicated above within the designated time period. Requests for extension of the time to file an appeal must be submitted in writing to the address listed above, and will only be granted upon a showing of good cause.

            Sincerely,

            Conor Ahern

CITY OF NEW YORK
COMMISSION ON HUMAN RIGHTS

In the Matter of the Complaint of:

DEBORAH ASCHHEIM,

                Complainant,

- against -

NEW YORK CITY ECONOMIC DEVELOPMENT
CORPORATION,

                Respondent.

Complaint No.: M-E-A-17-24252
Fed. Charge No.: 16F-2017-00353C

NOTICE OF ADMINISTRATIVE
CLOSURE

Pursuant to Section 8-113 of the Administrative Code of the City of New York and Rule 1-22(a)(5) of the Rules of Practice of the City Commission on Human Rights the above-captioned case is hereby dismissed for administrative convenience because prosecution of the complaint will not serve the public interest. This dismissal does not affect the right of aggrieved parties to file a civil action pursuant to Section 8-502 of the Administrative Code of the City of New York.

Pursuant to Section 8-113(f) of the Administrative Code of the City of New York and Rule 1-22(f) of the Rules of Practice a complainant or respondent may apply to the Office of the Chairperson for review of this dismissal. The request for review must be made in writing within thirty days of service of this order. A copy of the request must be sent to all parties to the complaint and addressed to the Office of General Counsel, New York City Commission on Human Rights, 22 Reade Street, New York, NY 10007. The Office of General Counsel will refer the request to the Office of the Chairperson.

Dated:    New York, New York
         January 31, 2018

                                    Hollis Pfitsch
                                    Deputy Commissioner
                                    Law Enforcement Bureau

TO:

Deborah Aschheim, Esq.
383 West End Avenue
New York, NY 10024

Edna Guerrasio, Esq.
11 Times Square
New York, NY 10036-8299

Exhibit E

Aschheim Vs. New York City Economic Development Corporation (NYCEDC)

III.E    Supplement Materials

Exhibit E – Plaintiff Right To Sue Request to EEOC (March 5, 2018)

## Deborah S. Aschheim

383 West End Avenue
New York, NY 10024
Tel. 917.882.9949
debaschheim@gmail.com

March 5, 2018

BY OVERNIGHT MAIL AND REGULAR MAIL

Mr. Patrick Sanford
Federal Investigator
Equal Employment Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, New York 10004

Re:    Deborah S. Aschheim vs. New York City Economic Development Corporation
Charge Nos: - NYC Commission on Human Rights Complaint M-E-A-17-24252
- Federal Charge No. 16F-2017-00353C

Dear Mr. Sanford:

I am the charging party, in the above-referenced matter.

On February 5, 2018, I received the attached Administrative Dismissal Notification from the New York City Commission on Human Rights, dismissing my complaint against the NYC Economic Development Corporation for administrative convenience. Accordingly, I ask that the Equal Employment Opportunity Commission issue a Notice of Right to Sue so that I may proceed with legal action.

I further request a copy of the complete file in the above matter pursuant to the Freedom of Information Act, 5 U.S.C. § 552(a). See 29 C.F.R. § 1610.17(d). An Agreement of Nondisclosure is enclosed.

If you need additional information, please let me know.

Thank you for your prompt and favorable assistance.

Very truly yours,

Deborah S. Aschheim

Attachments

/

CITY OF NEW YORK
COMMISSION ON HUMAN RIGHTS
In the Matter of the Complaint of:

DEBORAH ASCHHEIM,

                              Complainant,          Complaint No.: M-E-A-17-24252
                                                    Fed. Charge No.: 16F-2017-00353C

              - against -

NEW YORK CITY ECONOMIC DEVELOPMENT              NOTICE OF ADMINISTRATIVE
CORPORATION,                                            CLOSURE

                              Respondent.

_____

        Pursuant to Section 8-113 of the Administrative Code of the City of New York and Rule 1-
22(a)(5) of the Rules of Practice of the City Commission on Human Rights the above-captioned case is
hereby dismissed for administrative convenience because prosecution of the complaint will not serve the
public interest. This dismissal does not affect the right of aggrieved parties to file a civil action pursuant
to Section 8-502 of the Administrative Code of the City of New York.

        Pursuant to Section 8-113(f) of the Administrative Code of the City of New York and Rule 1-
22(f) of the Rules of Practice a complainant or respondent may apply to the Office of the Chairperson for
review of this dismissal. The request for review must be made in writing within thirty days of service of
this order. A copy of the request must be sent to all parties to the complaint and addressed to the Office
of General Counsel, New York City Commission on Human Rights, 22 Reade Street, New York, NY
10007. The Office of General Counsel will refer the request to the Office of the Chairperson.

Dated:    New York, New York
          January 31, 2018

                                          Hollis Pfitsch
                                          Deputy Commissioner
                                          Law Enforcement Bureau

TO:


Deborah Aschheim, Esq.                    Edna Guerrasio, Esq.
383 West End Avenue                       11 Times Square
New York, NY 10024                        New York, NY 10036-8299



*Conor Ahern*
Staff Attorney
*Law Enforcement Bureau*
cdahern@cchr.nyc.gov
212-416-0219 (phone)
646-500-7025 (fax)

January 24, 2018

**VIA U.S. MAIL**

Deborah Aschheim, Esq.
383 West End Avenue
New York, NY 10024

Re:    *Deborah Aschheim v. New York City Economic Development Corporation*
       Complaint No.: M-E-A-17-24252; Fed. Charge No.: 16F-2017-00353C

Dear Ms. Aschheim:

The complaint of discrimination you filed with the New York City Commission on Human Rights ("Commission") has been dismissed for administrative convenience. This means the Law Enforcement Bureau has decided not to further investigate your complaint because it will not serve the public interest.

RIGHT TO FILE IN COURT: This determination preserves your right to file a civil action pursuant to Section 8-502 of the Administrative Code of the City of New York. This means you can now file the same claim in court or in another forum. You must file your claim within three (3) years after the discriminatory practice occurred, however, while your claim was pending at the Commission that time period was tolled, which means that time period does not count towards the calculation of the three (3) year deadline.

RIGHT TO APPEAL: If you do not agree with the decision to dismiss this complaint, you may ask the Office of the Chairperson to review it by writing a letter to the Office of General Counsel, New York City Commission on Human Rights, 22 Reade Street, New York, NY 10007. Your letter should explain the reasons you disagree with the decision. You must send your letter within thirty (30) days from the date you receive this notice. You must also send a copy to the Respondents.

If you have any questions about this process, you may call the Office of the Chair at (212) 416-0128. Please note, however, that appeal requests will not be accepted by telephone and must be submitted in writing to the address indicated above within the designated time period. Requests for extension of the time to file an appeal must be submitted in writing to the address listed above, and will only be granted upon a showing of good cause.

Sincerely,

Conor Ahern

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### AGREEMENT OF NONDISCLOSURE

Pursuant to Section 705g(1) of Title VII, the EEOC shall have power to cooperate with private individuals in order to accomplish the purposes of Title VII.

### PERSON REQUESTING DISCLOSURE

| X CHARGING PARTY | RESPONDENT | AGGRIEVED PERSON ON WHOSE BEHALF CHARGE IS FILED | AGGRIEVED PERSON IN COMMISSIONER CHARGE | NAMED PARTY IN CLASS ACTION |
|---|---|---|---|---|

ATTORNEY REPRESENTING

☐ CP   ☐ RESPONDENT   ☐ AGGRIEVED PERSON ON WHOSE BEHALF CHARGE IS FILED   ☐ AGGRIEVED PERSON IN COMMISSIONER CHARGE   ☐ NAMED PARTY IN CLASS ACTION

CASE CHARGE NUMBER OF FILE(S) TO BE DISCLOSED

## Federal Charge No.  16F-2017-00353C

### STATEMENT

I, DEBORAH S. ASCHHEIM, request disclosure of Commission case file(s) in connection with contemplated or pending litigation. I agree that the information disclosed to me will not be made public or used except in the normal course of a civil action or other proceeding instituted under TITLE VII involving such information.

In witness whereof, this agreement is entered into as of the 5ᵗʰ day of March, 2018, by the Equal Employment Opportunity Commission representative named below and the person requesting disclosure.

*Deborah S. Aschheim*

Deborah S. Aschheim                            917.882.9949

Person requesting disclosure *(Signature and telephone number/area code)*

383 West End Avenue, New York, NY  10024                    debaschheim@gmail.com

Complete address

EEOC representative *(Signature and title)*

EEOC FORM 167            PREVIOUS EDITIONS OF THIS FORM MAY BE USED

4

Exhibit F

Aschheim Vs. New York City Economic Development Corporation (NYCEDC)

III.E   Supplement Materials

Exhibit F - EEOC Right to Sue Letter (Received by Plaintiff April 9, 2018)

EEOC Form 161 (11/16)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Deborah ASCHHEIM<br>383 West End Avenue<br>New York, NY 10024 | From: New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16F-2017-00353 | Holly M. Shabazz,<br>State & Local Program Manager | (212) 336-3643 |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☒ Other (briefly state)    **Charging party wishes to pursue matter in Federal District Court.**

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

_Kevin J. Berry,_
**Kevin J. Berry,**
**District Director**

April 05, 2018

*(Date Mailed)*

Enclosures(s)

cc:

Attn: Director of Human Resources
**NEW YORK CITY ECONOMIC DEVELOPMENT
CORPORATION**
110 William Street
New York, NY 10038

Deborah Aschheim, Esq
383 West End Avenue
New York, NY 10024

Edna Guerrasio, Esq.
11 Times Square
New York, NY 10036-8299

70

# FACTS ABOUT FILING
## AN EMPLOYMENT DISCRIMINATION SUIT
## IN FEDERAL COURT IN NEW YORK STATE

You have received a document which is the final determination or other final action of the Commission. This ends our handling of your charge. The Commission's action is effective upon receipt. Now, you must decide whether you want to file a private lawsuit in court. This fact sheet answers several commonly asked questions about filing a lawsuit.

## WHERE SHOULD I FILE MY LAWSUIT?

Federal District Courts have strict rules concerning where you may file a suit. You may file a lawsuit against the respondent (employer, union, or employment agency) named in your charge. The appropriate court is the district court which covers either the county where the respondent is located or the county where the alleged act of discrimination occurred. However you should contact the court directly if you have questions where to file your lawsuit. New York State has four federal districts:

- The United States District Court for the Southern District of New York is located at 500 Pearl Street in Manhattan. It covers the counties of Bronx, Dutchess, New York (Manhattan), Orange, Putnam, Rockland, Sullivan, and Westchester. (212) 805-0136 http://www.nysd.uscourts.gov

- The United States District Court for the Eastern District of New York is located at 225 Cadman Plaza in Brooklyn and covers the counties of Kings (Brooklyn), Nassau, Queens, Richmond (Staten Island), and Suffolk. (718) 613-2600 http://www.nyed.uscourts.gov

- The United States District Court for the Western District of New York is located at 68 Court Street in Buffalo. It covers the counties of Allegheny, Cattaraugus, Chautauqua, Chemung, Erie, Genesee, Livingston, Monroe, Niagara, Ontario, Orleans, Schuyler, Seneca, Steuben, Wayne, Wyoming, and Yates. (716) 551-4211 http://www.nywd.uscourts.gov
332 -1700

- The United States District Court for the Northern District of New York is located at 100 South Clinton Street in Syracuse and covers the counties of Albany, Broome, Cayuga, Chanango, Clinton, Columbia, Cortland, Delaware, Essex, Franklin, Fulton, Greene, Hamilton, Herkimer, Jefferson, Lewis, Madison, Montgomery, Oneida, Onandaga, Oswego, Ostego, Rensselaer, St. Lawrence, Saratoga, Schenectady, Schoharie, Tioga, Tompkins, Ulster, Warren, and Washington. This District Court's *Pro Se* Attorney has offices at 10 Broad Street in Utica New York. (315) 234-8500 http://www.nynd.uscourts.gov

## WHEN MUST I FILE MY LAWSUIT?

Your private lawsuit must be filed in U.S. District Court within **90 days** of the date you receive the enclosed EEOC Notice of Right To Sue. Otherwise, you will have lost your right to sue.

(Over)

Case 1:18-cv-05981-AJN   Document 1   Filed 07/02/18   Page 72 of 77

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
New York District Office
33 Whitehall Street, 5th Fl
New York, N.Y. 10004

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

NEW YORK



02 1P          $ 000.47⁰
000806697    APR 06 2018
MAILED FROM ZIP CODE 10004

Appendix 2

Aschheim Vs. New York City Economic Development Corporation (NYCEDC)

V – Relief – Calculation of Damages

# Aschheim vs. NYCEDC Damages Calculator      Benefits Damages

Case 1:18-cv-05981-AJN   Document 1   Filed 07/02/18   Page 74 of 77

| | | month | annual | 80% | Amount | Total | Comments |
|---|---|---|---|---|---|---|---|
| **2017** | HEALTH & WELFARE | | | | | | |
| | Medical Plan | 3,000 | 36,000 | 28,800 | 28,800 | | These are the amounts under my personal (private) plan for my family.  Coverage in 2017 was more expensive and better than the offerings in 2018. |
| **1** | Dental | 230 | 2,754 | 2,203 | 2,203 | | These are the amounts under my personal (private) plan. |
| | Vision | 41 | 492 | 394 | 394 | | These are the amounts under my personal (private) plan. |
| | SOCIAL SECURITY | | | | | | |
| | RETIREMENT SAVINGS PLANS | | | | | | |
| | Pension | | 5,700 | | 5,700 | | Salary at $95,000; 6% |
| | 401k / 403b | | 0 | 0 | 0 | | Assume No Match; just tax benefit |
| | 457 | | 0 | 0 | 0 | | Assume No Match; just tax benefit |
| | FLEX SPENDING | | | | | | |
| | Health | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | Transportation | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | ChildCare | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | SHORT TERM DISABILITY | | | | | | |
| | LONG TERM DISABILITY | | | | | | |
| | PARENTAL LEAVE | | 0 | 0 | 0 | | |
| | SALARY CONTINUATION PROGRAM | | | | | | Not sure how this differs from LTD.  Assumes 100% salary for 3-6 months; 75% 6-9 months; 60%salary thereafter, until age 65. |
| | LIFE INS & ADD INS | | | | | | |
| | Life | 50 | 600 | 480 | 480 | | Assumes 10 yr term ins for $250K; Assumes benefit would be Premium only ($50/mo) and not the actual death benefit; 80% P paid by NYCEDC |
| | ADD | 10 | 120 | 96 | 96 | | Assumes benefit would be Premium only ($10/mo) and not the actual death benefit; 80% P paid by NYCEDC |
| | VACATION / SICK / HOLIDAYS | | | | | | |
| | vacation (3 weeks) | | 5,481 | | 5,481 | | Salary at $95,000 |
| | sick (2 weeks) | | 3,654 | | 3,654 | | Salary at $95,000 |
| | Holidays (2 weeks) | | 3,654 | | 3,654 | | Salary at $95,000 |
| | EAP | | 0 | 0 | 0 | | |
| | TUITION REIMB | | 5,250 | | 5,250 | | |
| | TRANSPORTATION PLAN | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | 529 COLLEGE SAVINGS PLAN | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | OPTIONAL BENEFITS | | | | 10,000 | $ 65,711 | Assumed |

| | | month | annual | 80% | Amount | Total | Comments |
|---|---|---|---|---|---|---|---|
| **2018** | HEALTH & WELFARE | | | | | | |
| | Medical Plan | 2,500 | 30,000 | 24,000 | 24,000 | | These are the amounts under my personal (private) plan. |
| **2** | Dental | 250 | 2,994 | 2,395 | 2,395 | | These are the amounts under my personal (private) plan. |
| | Vision | 45 | 541 | 433 | 433 | | These are the amounts under my personal (private) plan. |
| | SOCIAL SECURITY | | | | | | |
| | RETIREMENT SAVINGS PLANS | | | | | | |
| | Pension | | 6,300 | | 6,300 | | Salary at $105,000; 6% match |
| | 401k / 403b | | 0 | 0 | 0 | | Assume No Match; just tax benefit |
| | 457 | | 0 | 0 | 0 | | Assume No Match; just tax benefit |
| | FLEX SPENDING | | | | | | |
| | Health | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | Transportation | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | ChildCare | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | SHORT TERM DISABILITY | | | | | | |
| | LONG TERM DISABILITY | | | | | | |
| | PARENTAL LEAVE | | 0 | 0 | 0 | | |

Case 1:18-cv-05981-AJN Document 1 Filed 07/02/18 Page 75 of 77

| | | month | annual | 80% | Amount | Total | |
|---|---|---|---|---|---|---|---|
| | SALARY CONTINUATION PROGRAM | | | | | | Not sure how this differs from LTD. Assumes 100% salary for 3-6 months; 75% 6-9 months; 60%salary thereafter, until age 65. |
| | LIFE INS & ADD INS | | | | | | |
| | Life | 50 | 600 | 480 | 480 | | Assumes 10 yr term ins for $250K; Assumes benefit would be Premium only ($50/mo) and not the actual death benefit; 80% P paid by NYCEDC |
| | ADD | 10 | 120 | 96 | 96 | | Assumes benefit would be Premium only ($10/mo) and not the actual death benefit; 80% P paid by NYCEDC |
| | VACATION / SICK / HOLIDAYS | | | | | | |
| | vacation (3 weeks) | | 6,058 | | 6,058 | | Salary @105,000 |
| | sick (2 weeks) | | 4,038 | | 4,038 | | Salary @105,000 |
| | Holidays (2 weeks) | | 4,038 | | 4,038 | | Salary @105,000 |
| | EAP | | 0 | 0 | 0 | | |
| | TUITION REIMB | | 5,250 | | 5,250 | | |
| | TRANSPORTATION PLAN | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | 529 COLLEGE SAVINGS PLAN | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | OPTIONAL BENEFITS | | | | 10,000 | $ 63,089 | Assumed |

*Aschheim vs NYCEDC*

**2019**
**3**

| | | month | annual | 80% | Amount | Total | |
|---|---|---|---|---|---|---|---|
| | HEALTH & WELFARE | | | | | | |
| | Medical Plan | 2,750 | 33,000 | 26,400 | 26,400 | | Assume 10% increase over prior year |
| | Dental | 274 | 3,293 | 2,635 | 2,635 | | Assume 10% increase over prior year |
| | Vision | 50 | 595 | 476 | 476 | | Assume 10% increase over prior year |
| | SOCIAL SECURITY | | | | | | |
| | RETIREMENT SAVINGS PLANS | | | | | | |
| | Pension | | 6,900 | | 6,900 | | Salary at $115,000; 6% match |
| | 401k / 403b | | 0 | 0 | 0 | | Assume No Match; just tax benefit |
| | 457 | | 0 | 0 | 0 | | Assume No Match; just tax benefit |
| | FLEX SPENDING | | | | | | |
| | Health | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | Transportation | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | ChildCare | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | SHORT TERM DISABILITY | | | | | | |
| | LONG TERM DISABILITY | | | | | | |
| | PARENTAL LEAVE | | 0 | 0 | 0 | | |
| | SALARY CONTINUATION PROGRAM | | | | | | Not sure how this differs from LTD. Assumes 100% salary for 3-6 months; 75% 6-9 months; 60%salary thereafter, until age 65. |
| | LIFE INS & ADD INS | | | | | | |
| | Life | 50 | 600 | 480 | 480 | | Assumes 10 yr term ins for $250K; Assumes benefit would be Premium only ($50/mo) and not the actual death benefit; 80% P paid by NYCEDC |
| | ADD | 10 | 120 | 96 | 96 | | Assumes benefit would be Premium only ($10/mo) and not the actual death benefit; 80% P paid by NYCEDC |
| | VACATION / SICK / HOLIDAYS | | | | | | |
| | vacation (3 weeks) | | 6,635 | | 6,635 | | Salary @115,000 |
| | sick (2 weeks) | | 4,423 | | 4,423 | | Salary @115,000 |
| | Holidays (2 weeks) | | 4,423 | | 4,423 | | Salary @115,000 |
| | EAP | | 0 | 0 | 0 | | |
| | TUITION REIMB | | 5,250 | | 5,250 | | |
| | TRANSPORTATION PLAN | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | 529 COLLEGE SAVINGS PLAN | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| | OPTIONAL BENEFITS | | | | 10,000 | $ 67,718 | Assumed |

**2020**
**4**

| | | month | annual | 80% | Amount | Total | |
|---|---|---|---|---|---|---|---|
| | HEALTH & WELFARE | | | | | | |
| | Medical Plan | 3,025 | 36,300 | 29,040 | 29,040 | | Assume 10% increase over prior year |
| | Dental | 302 | 3,623 | 2,898 | 2,898 | | Assume 10% increase over prior year |
| | Vision | 55 | 655 | 524 | 524 | | Assume 10% increase over prior year |

Aschheim vs NYCEDC

| | | | | | | |
|---|---|---|---|---|---|---|
| SOCIAL SECURITY | | | | | | |
| RETIREMENT SAVINGS PLANS | | | | | | |
| Pension | | 12,500 | | 12,500 | | Salary at $125,000; 10% match |
| 401k / 403b | | 0 | 0 | 0 | | Assume No Match; just tax benefit |
| 457 | | 0 | 0 | 0 | | Assume No Match; just tax benefit |
| FLEX SPENDING | | | | | | |
| Health | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| Transportation | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| ChildCare | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| SHORT TERM DISABILITY | | | | | | |
| LONG TERM DISABILITY | | | | | | |
| PARENTAL LEAVE | | 0 | 0 | 0 | | |
| SALARY CONTINUATION PROGRAM | | | | | | Not sure how this differs from LTD. Assumes 100% salary for 3-6 months; 75% 6-9 months; 60%salary thereafter, until age 65. |
| LIFE INS & ADD INS | | | | | | |
| Life | 50 | 600 | 480 | 480 | | Assumes 10 yr term ins for $250K; Assumes benefit would be Premium only ($50/mo) and not the actual death benefit; 80% P paid by NYCEDC |
| ADD | 10 | 120 | 96 | 96 | | Assumes benefit would be Premium only ($10/mo) and not the actual death benefit; 80% P paid by NYCEDC |
| VACATION / SICK / HOLIDAYS | | | | | | |
| vacation (3 weeks) | | 7,212 | | 7,212 | | Salary @125,000 |
| sick (2 weeks) | | 4,808 | | 4,808 | | Salary @125,000 |
| Holidays (2 weeks) | | 4,808 | | 4,808 | | Salary @125,000 |
| EAP | | 0 | 0 | 0 | | |
| TUITION REIMB | | 5,250 | | 5,250 | | |
| TRANSPORTATION PLAN | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| 529 COLLEGE SAVINGS PLAN | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| OPTIONAL BENEFITS | | | | 10,000 | $ 77,615 | Assumed |

2021

| | month | annual | 80% | Amount | Total | |
|---|---|---|---|---|---|---|
| HEALTH & WELFARE | | | | | | |
| Medical Plan | 3,328 | 39,930 | 31,944 | 31,944 | | Assume 10% increase over prior year |
| Dental | 332 | 3,985 | 3,188 | 3,188 | | Assume 10% increase over prior year |
| Vision | 60 | 720 | 576 | 576 | | Assume 10% increase over prior year |
| SOCIAL SECURITY | | | | | | |
| RETIREMENT SAVINGS PLANS | | | | | | |
| Pension | | 16,800 | | 16,800 | | Salary @140,000; 12% match |
| 401k / 403b | | 0 | 0 | 0 | | Assume No Match; just tax benefit |
| 457 | | 0 | 0 | 0 | | Assume No Match; just tax benefit |
| FLEX SPENDING | | | | | | |
| Health | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| Transportation | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| ChildCare | | 0 | 0 | 0 | | Assume No contribution; just tax benefit |
| SHORT TERM DISABILITY | | | | | | |
| LONG TERM DISABILITY | | | | | | |
| PARENTAL LEAVE | | 0 | 0 | 0 | | |
| SALARY CONTINUATION PROGRAM | | | | | | Not sure how this differs from LTD. Assumes 100% salary for 3-6 months; 75% 6-9 months; 60%salary thereafter, until age 65. |
| LIFE INS & ADD INS | | | | | | |
| Life | 50 | 600 | 480 | 480 | | Assumes 10 yr term ins for $250K; Assumes benefit would be Premium only ($50/mo) and not the actual death benefit; 80% P paid by NYCEDC |
| ADD | 10 | 120 | 96 | 96 | | Assumes benefit would be Premium only ($10/mo) and not the actual death benefit; 80% P paid by NYCEDC |
| VACATION / SICK / HOLIDAYS | | | | | | |
| vacation (4 weeks) | | 10,769 | | 10,769 | | Salary @140,000 |
| sick (2 weeks) | | 5,385 | | 5,385 | | Salary @140,000 |

Aschheim vs NYCEDC 77

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Holidays (2 weeks) | | 5,385 | | 5,385 | | | Salary @140,000 |
| EAP | | 0 | 0 | 0 | | | |
| TUITION REIMB | | 5,250 | | 5,250 | | | |
| TRANSPORTATION PLAN | | 0 | 0 | 0 | | | Assume No contribution; just tax benefit |
| 529 COLLEGE SAVINGS PLAN | | 0 | 0 | 0 | | | Assume No contribution; just tax benefit |
| OPTIONAL BENEFITS | | | | 10,000 | $ | 89,873 | Assumed |

| | | month | annual | 80% | Amount | Total | |
|---|---|---|---|---|---|---|---|
| HEALTH & WELFARE | | | | | | | |
| **2022** | Medical Plan | 3,660 | 43,923 | 35,138 | 35,138 | | Assume 10% increase over prior year |
| **6** | Dental | 365 | 4,384 | 3,507 | 3,507 | | Assume 10% increase over prior year |
| | Vision | 66 | 792 | 634 | 634 | | Assume 10% increase over prior year |
| SOCIAL SECURITY | | | | | | | |
| RETIREMENT SAVINGS PLANS | | | | | | | |
| | Pension | | 21,700 | | 21,700 | | Salary @155,000; 14% match |
| | 401k / 403b | | 0 | 0 | 0 | | Assume No Match; just tax benefit |
| | 457 | | 0 | 0 | 0 | | Assume No Match; just tax benefit |